RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GARY T. WINNETT, et al.,

     *Plaintiffs-Appellees*,

     *v.*

CATERPILLAR, INC.,

     *Defendant-Appellant*.

No. 07-6275

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00235—Aleta Arthur Trauger, District Judge.

Argued: September 23, 2008

Decided and Filed: January 27, 2009

Before: MARTIN, ROGERS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Joseph J. Torres, WINSTON & STRAWN, LLP, Chicago, Illinois, for Appellant. William T. Payne, STEMBER, FEINSTEIN, DOYLE & PAYNE, LLC, Pittsburgh, Pennsylvania, for Appellees. **ON BRIEF:** Joseph J. Torres, Columbus R. Gangemi, Jr., WINSTON & STRAWN, LLP, Chicago, Illinois, for Appellant. William T. Payne, John E. Stember, Pamina Grace Ewing, STEMBER, FEINSTEIN, DOYLE & PAYNE, LLC, Pittsburgh, Pennsylvania, Elizabeth Ann Alexander, LIEFF, CABRASER, HEIMANN & BERNSTEIN, Nashville, Tennessee, Michael M. Mulder, MEITES, MULDER, MOLLICA & GLINK, Chicago, Illinois, Jay E. Sushelsky, AARP FOUNDATION LITIGATION, Washington, D.C., for Appellees. Phillip A. Kilgore, Brian D. Black, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Diane M. Soubly, SEYFARTH SHAW, LLP, Boston, Massachusetts, Donald L. Havermann, Daniel P. Bordoni, John F. Ring, MORGAN, LEWIS & BOCKIUS, LLP, Washington, D.C., for Amici Curiae.

     MARTIN, J., delivered the opinion of the court, in which SUTTON, J., joined. ROGERS, J. (p. 18), delivered a separate opinion concurring in all but Part II.A.

1

————————————

**OPINION**

————————————

BOYCE F. MARTIN, JR., Circuit Judge.   Plaintiffs are retired workers from Defendant Caterpillar.  They  argue that Caterpillar breached its promise to provide lifetime retiree medical benefits at no cost when it began charging them for a portion of their medical care.  Most of their claims turn on whether a 1988 collective labor agreement provided workers with a right to no-cost retiree medical benefits that vested *as soon as* the worker became eligible for retirement or a pension.  We hold that it did not.  Accordingly, we REVERSE and REMAND for further proceedings.

I.

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) represents Caterpillar workers and negotiates labor contracts on their behalf.  These contracts include central labor agreements and related benefits agreements.  The workers here retired between the time that the 1988 Central Labor Agreement expired in 1991 and when Caterpillar and the UAW agreed to a successor agreement in 1998.  The workers want the lifetime no-cost retiree medical benefits offered under the 1988 Central Labor Agreement.

The 1988 Central Labor Agreement itself did not describe retiree medical benefits.  Rather, a separate document, "Benefits Plans under the 1988 Collective Bargaining Agreement," contained an insurance plan agreement and appended group insurance plan describing the terms of retiree medical benefits.[1]   And Caterpillar also issued a 1988 Summary Plan Description.[2]  But none of the documents discussed explicitly when the right to retiree medical benefits vested.

———————————————

[1]Plaintiffs do not challenge Caterpillar's contention that the insurance plan agreement/group insurance plan is a labor contract under the Labor-Management Relations Act and a welfare benefit plan under ERISA.  29 U.S.C. § 185, § 1002(1).

[2]A summary plan description is a publication explaining the benefits of a particular welfare benefit plan. ERISA requires employers to distribute summary plan descriptions to their employees. 29 U.S.C. § 1022 (1988).

The 1988 Collective Labor Agreement was set to expire on October 1, 1991, but the parties agreed to extend it while they continued negotiations. The extension ended on November 3, when UAW workers began striking at some Caterpillar facilities. On March 31, 1992, Caterpillar told the UAW that effective April 6, it would implement portions of its final contract offer—including health care network provisions—applicable to active and retired employees. In response, the UAW filed an unfair labor practices charge with the National Labor Relations Board, which investigated and determined that Caterpillar was entitled to declare and implement the proposed changes. On November 20, following more unsuccessful negotiations, Caterpillar advised the UAW that, effective December 1, it would unilaterally and retroactively implement caps on the amount Caterpillar would pay for retiree health coverage for employees who retired after January 1, 1992. The UAW did not challenge the second announced implementation as it had the one announced March 31.

Caterpillar and the UAW did not reach a comprehensive successor collective labor agreement until 1998. It became effective on March 16. The 1998 Group Insurance Plan included health care network provisions. The parties disagree on whether the 1998 Collective Labor Agreement and Insurance Plan Agreements ratified the retiree health cost caps Caterpillar had unilaterally instituted in 1992. Caterpillar issued a summary plan description in 1999 that provided for caps on benefits.

Caterpillar also agreed to contribute $35 million to a voluntary employee benefits association designed to pay expenses incurred by post-January 1, 1992 retirees and their dependents above the caps unilaterally implemented in 1992. In 2002, 2003, and 2004, Caterpillar mailed letters to retirees advising them that once the voluntary employee benefits association funds were depleted, those retirees would be required to pay their health care coverage costs exceeding the cap.

In 2004, Caterpillar and the UAW agreed on a successor Insurance Plan Agreement which provided that, on a going forward basis, Caterpillar would share in the "above the cap" costs on a 40/60 basis. In 2005, Caterpillar announced its intention to begin charging health care premiums for the class members. But in 2006 Caterpillar

announced it would waive premiums for any existing surviving spouses. At the time of the district court's decision, Caterpillar was not actually charging surviving spouses premiums.

Plaintiffs filed this suit under Section 301(a) of the Labor-Management Relations Act,[3] and Sections 502(e) and (f) of the Employee Retirement Income Security Act[4] asking for injunctive relief and an order declaring that they are entitled to the no-cost retiree medical benefits described under the 1988 labor agreements. The district court later certified a main class and three subclasses. This interlocutory appeal concerns only the claims of workers who: (1) began working for Caterpillar before the 1988 Collective Labor Agreement expired; and (2) were pension and retirement eligible prior to January 1, 1992; and (3) who retired on or after January 1, 1992 but before March 16, 1998. These workers retired during the period when there was no collective labor agreement in force.

Caterpillar argued that the court lacked subject-matter jurisdiction over Plaintiffs' LMRA and ERISA claims because the 1988 Collective Bargaining Agreement was

---

[3]That section provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. §185(a).

[4]That section provides:

> A civil action may be brought –
>
> by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of a plan.
> . . . .
>
> [or] by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. §1132(a)(1)(B), (a)(3).

expired by the time Plaintiffs retired.  It maintained that the court could not determine rights under an expired contract, and there was thus not a "contract" or "plan" which Caterpillar could have violated with respect to workers who retired *after* its expiration. The district court rejected this challenge, and concluded that the right to the retiree medical benefits "vested when the employees attained retirement or pension eligibility," even for those who continued working after becoming retirement-eligible.  *Winnett v. Caterpillar*, 496 F. Supp. 2d 904, 922 (M.D. Tenn. 2007).

Caterpillar then asked the district court to certify for interlocutory appeal: "[W]hether the court has subject-matter jurisdiction over plaintiffs' LMRA Section 301 and ERISA claims."   The district court granted the motion, observing that the jurisdictional question turns "on purely the legal issue of whether the plaintiffs' rights to retirement medical benefits could vest under the 1988 labor contracts while they were active, union-represented employees," and finding "substantial ground for difference of opinion" on: (1) whether retirement benefits vest upon eligibility for retirement or upon actual retirement, and (2) whether the inference that "parties likely intended [retiree] benefits to continue as long as the beneficiary remains a retiree" applies to active, in-service employees.

## II.

### A.

The parties initially square off over whether Rule 12(b)(6) or Rule 12(b)(1) governs Caterpillar's motion to resolve this case on the pleadings.  Generally speaking, Rule 12(b)(6) permits a defendant to seek relief on the ground that a cause of action fails as a matter of law, regardless of whether the plaintiff's factual allegations are true or not, while Rule 12(b)(1) permits a defendant to seek relief on the ground that the court has no subject-matter jurisdiction over the dispute.  That distinction is usually relatively easy to administer.  Not so, however, in Section 301 claims:  In a series of cases, we have held that a failure to state a claim under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), creates a jurisdictional defect.  *See Bauer v. RBX Indus.*, 368 F.3d 569, 578 (6th Cir. 2004); *Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1386 (6th Cir.

1994); *Heussner v. Nat'l Gypsum Co.*, 887 F.2d 672, 676 (6th Cir. 1989).  Because the Supreme Court has recently clarified that this kind of shortcoming affects only the merits of the claim, not the district court's subject-matter jurisdiction over it, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515-16 (2006), we take this opportunity to clarify our case law on the issue.

In *Arbaugh*, the Supreme Court considered whether Congress, by permitting Title VII discrimination suits only against employers with more than fifteen employees, 42 U.S.C. § 2000e-2(a)(1), had intended to limit the subject-matter jurisdiction of the federal courts or merely to list one element of a Title VII cause of action.  546 U.S. at 503.  Noting that "subject-matter jurisdiction . . . and the essential ingredients of a federal claim" are "sometimes confused or conflated," *id.* (internal quotation marks omitted), the court faulted the many "drive-by jurisdictional rulings" that label the elements of a cause of action as "jurisdictional" without attention either to indicia of Congressional intent or to the consequences of such a ruling. *Id.* at 511 (internal quotation marks omitted).  Attempting to clarify this area of the law, *Arbaugh* announced a "readily administrable bright line" for determining when a statutory requirement is jurisdictional:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.  But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* at 515–16 (internal quotation marks, citation and footnote omitted).

Prior to *Arbaugh*, we held that Section 301(a) plaintiffs must show that a union contract was breached to establish federal subject-matter jurisdiction over their claims. *See Bauer*, 368 F.3d at 578; *Adcox*, 21 F.3d at 1386; *Heussner*, 887 F.2d at 676.  But these holdings do not survive *Arbaugh*'s effort to bring clarity to this area.  All three cases appear to be classic "drive-by jurisdictional rulings," *Arbaugh*, 546 U.S. at 511 (internal quotation marks omitted):  *Heussner* attached the label of "subject-matter jurisdiction" to the breach-of-contract requirement without examining the consequences

that follow from such a designation and without considering whether that is what Congress had in mind. *See Heussner*, 887 F.2d at 675–77. *Bauer* and *Adcox* merely followed *Heussner's* lead, *Bauer,* 368 F.3d at 579 n.5; *Adcox*, 21 F.3d at 1386, with the former even noting that "[t]here is some ambiguity over whether the expiration or supersession of a labor contract . . . is better viewed as raising a jurisdictional problem or, instead, a failure-to-state-a-claim problem." 368 F.3d at 579 n.5. Most importantly, none of these cases addresses the question that *Arbaugh* now tells us to ask: Did Congress "clearly state[]," 546 U.S. at 515, that the existence of a union contract is a jurisdictional prerequisite for a Section 301(a) claim?

Consistent with *Arbaugh*, we now ask and answer that question. Nothing in Section 301(a) indicates that Congress meant to attach subject-matter jurisdiction consequences to the failure to state a cognizable Section 301 claim, and still less does anything in the statute do so "clearly." Here is what Section 301(a) says:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Labor Management Relations Act § 301(a), 29 U.S.C. 185(a). The only direct mention of "jurisdiction" in the statute refers to personal jurisdiction, not subject-matter jurisdiction. And even then, the point of the reference is to ease access to the federal courts, not to impose new barriers. The same is true of later references that implicitly do address subject-matter jurisdiction: The statute relaxes subject-matter jurisdiction by permitting federal courts to handle such cases without regard to the amount in controversy or the existence of diversity jurisdiction. Yet nothing, clearly or otherwise, says that Congress meant litigants and courts to endure the "unfairness and waste of judicial resources" that can flow from giving a subject-matter jurisdiction label to an element of a cause of action. *See Arbaugh*, 546 U.S. at 515 (alteration and internal quotation marks omitted).

The structure of the provision offers another clue that the contract requirement is non-jurisdictional. *All* of the elements of a plaintiff's prima facie claim for the breach of a union contract appear in the same subsection. 29 U.S.C. § 185(a). Yet nothing in the statute offers any foothold for the notion that some of these elements of a Section 301 claim, but not others, have subject-matter-jurisdictional consequences. If the existence of a union contract limits our jurisdiction over a case, that would mean every other prima facie element of a Section 301(a) claim—that the plaintiff be a labor organization, that the defendant be a labor organization or an employer, that both the plaintiff and the defendant be parties to the contract and that the suit be "for violation of [that] contract[]", 29 U.S.C. § 185(a)—would have similar consequences as well. Even in the absence of *Arbaugh*'s "clearly states" requirement, we should be reluctant to conclude that Congress intended to create a cause of action that has no non-jurisdictional elements.

*Arbaugh* also tells us not just to look at labels but also pragmatically to consider the consequences of giving a jurisdictional label to an element of a cause of action. There are several real-world considerations at play here if we treat the existence of a valid collective bargaining agreement as a jurisdictional prerequisite to entry to the federal courts. First, while subject-matter jurisdiction can never be waived or forfeited, *Arbaugh*, 546 U.S. at 514, we usually require timely and reasoned presentation of non-jurisdictional issues to avoid forfeiture. *See, e.g., Leary v. Livingston County*, 528 F.3d 438, 449 (6th Cir. 2008) (conclusory arguments are waived); *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) (failure to present an argument to a district court generally forfeits the right to present it on appeal); *United States v. Moore*, 376 F.3d 570, 576 (6th Cir. 2004) (failure to raise arguments in opening memorandum or brief leads to forfeiture). These waiver and forfeiture rules ensure fair and evenhanded litigation by requiring parties to disclose legal theories early enough in the case to give an opposing party time not only to respond but also to develop an adequate factual record supporting their side of the dispute. *See Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005). They also further judicial efficiency and lower litigation costs by encouraging parties to consolidate the issues they present to the courts

for review and by avoiding unnecessary appeals of issues that could have been adequately resolved below. *See Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 365 (2d Cir. 2000).

Second, when a court lacks subject-matter jurisdiction over a claim, it must immediately dismiss not just that claim but any pendent state-law claims as well—no matter how late in the case the district or appellate court identifies the jurisdictional defect. *See Arbaugh*, 546 U.S. at 514. That approach contrasts sharply with the federal courts' normal practices. Under § 1367(c)(3) of Title 28, the federal courts have discretion to retain supplemental jurisdiction over state-law claims even after all claims within the court's original jurisdiction have been dismissed. This discretion permits the courts to "conserv[e] judicial energy" and to avoid the "multiplicity of litigation" that would arise if pendent claims had to be abandoned, regardless of the amount of effort expended in the federal litigation. *Rosado v. Wyman*, 397 U.S. 397, 405 (1970). We should not lightly infer that Congress means to impose such wasteful inefficiencies on the parties or the courts.

Third, while it would seem to be the rare party that would let a jurisdictional defect lie until it lost the initial round of litigation, there can be little doubt that a first-round loss in a case tends to sharpen the tactical focus of the losing party. Yet once the courts label an element of a cause of action jurisdictional, they have no option but to entertain lately raised arguments, whether the delay flows from initial negligence or an unsavory litigation strategy. In *Arbaugh* itself, the defendant first admitted that jurisdiction was proper, then, after losing a trial on the merits of both the Title VII and the pendent state law claims, sought to have the jury's verdict vacated on the ground that subject-matter jurisdiction was lacking. 546 U.S. at 507–08; *see also Bauer*, 368 F.3d at 572 (noting that the plaintiffs, who had originally invoked the federal subject-matter jurisdiction, began to dispute it only after the court granted summary judgment to the defendants). Before we entertain such arguments, *Arbaugh* tells us to ask whether Congress clearly meant for us to consider them.

Here, Congress gave no such indication, and accordingly we hold that, consistent with *Arbaugh,* the existence of a union contract is an element of Plaintiffs' merits claim, not a limit on federal subject-matter jurisdiction. To the extent our earlier cases held to the contrary, they are overruled. Consequently, the proper vehicle to challenge the existence of a union contract is a Rule 12(b)(6) motion.

## B.

Caterpillar, laboring under our pre-*Arbaugh* decisions, raised its challenge to the existence of a contract under Rule 12(b)(1). So technically only subject-matter jurisdiction, and not the merits of Plaintiffs' claim, is before us on this interlocutory appeal. But in this case, we may reach the merits without causing prejudice to Plaintiffs by deciding the vesting issue on the pleadings. *See Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 917 (6th Cir. 1986) (reviewing an issue raised under Rule 12(b)(1) "as if plaintiff had filed a Rule 12(b)(6)"). This is because, even construing Plaintiffs' allegations in a light most favorable to them, a claim based on retiree medical benefits vesting before workers retired fails as a matter of law. Plaintiffs maintain that additional discovery would reveal extrinsic evidence in support of their interpretation of the document language. But, as discussed below, the controlling documents cannot reasonably be interpreted to vest retiree benefits while workers are still active and represented by their union. Because no amount of additional discovery would render the controlling documents ambiguous on this point, Plaintiffs are not prejudiced by our reaching the merits now. And as the district court observed, our decision on the vesting question "has the potential to save the parties and the judicial system significant resources" because "[i]f the Sixth Circuit reverses the court's finding as to vesting . . . the vast majority of the claims would be resolved." *Winnett v. Caterpillar, Inc.*, 2007 WL 2123905, *6 (M.D. Tenn. Jul. 20, 2007). Thus, we consider Caterpillar's arguments as if they had been raised in a Rule 12(b)(6) motion.

III.

Plaintiffs allege that Caterpillar violated the terms of the 1988 Central Labor Agreement when it unilaterally made changes to the retiree medical benefits.  According to Plaintiffs, their right to retiree medical benefits is vested—meaning the benefits cannot be changed without Plaintiffs' consent.  But Plaintiffs retired *after* the 1988 Central Labor Agreement expired.  So we must decide whether the controlling document language demonstrates the parties' intent for retiree medical benefits to vest before workers retired.  If not, Caterpillar could not have breached the 1988 Central Labor Agreement with respect to workers who retired after its expiration.

A.

The enforcement and interpretation of collective bargaining agreements under Section 301 is governed by substantive federal law, *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456 (1957), but courts should apply traditional rules for contractual interpretation so long as their application is consistent with federal labor policies,  *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).  The point at which certain retirement medical benefits vest under a collective labor agreement depends upon the parties' intent.  *Id.*  To determine this, we first look first to explicit contractual language, but resort to extrinsic evidence if the language of the labor agreements is ambiguous. *UAW v. BVR Liquidating,* 190 F.3d 768, 772, 774 (6th Cir. 1999).  Ambiguous language is "subject to two reasonable interpretations,"  *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994).  "[E]xtrinsic evidence, however, cannot be considered when contract language is unambiguous." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 593 (6th Cir. 2006).

 We "interpret each provision in question as part of the integrated whole" and "consistently with . . . the relative positions and purposes of the parties."  *Id*. at 579. Retiree medical benefits are welfare benefits, which do not vest automatically under either ERISA or labor contract principles.  *Bauer*, 368 F.3d at 584.  We do not infer an intent to vest benefits in the absence of explicit contractual language or, in the case of ambiguous contract language, extrinsic evidence indicating such an intent.  *Id.*at 591.

If a welfare benefit has not vested, "after a [collective labor agreement] expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to the [collective labor agreement]." *Id.* at 578. But once benefits vest, an employer's unilateral modification or reduction of benefits constitutes a Section 301 violation.[5] *Maurer*, 212 F.3d at 914.

B.

We thus begin with the explicit contractual language. None of the controlling documents refers to"vesting" of retiree medical benefits for active employees. The 1988 Group Insurance Plan provides the following information about retiree medical benefits: "Retired Employees who satisfy the requirements hereinafter set forth shall be entitled to the same benefits provided in this Section V as if they were Employees." "Section V" states that medical benefits are "be provided without cost to the Employee."'

With respect to eligibility, the 1988 Group Insurance Plan states:

> Coverage . . . shall be provided without cost to any such retired Employee . . . [and] will be provided after his retirement from active service for a retired Employee if he has at least 5 years of credited service under the Non-Contributory Pension Plan at his retirement and is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan or would be eligible for such immediate commencement but for his election to defer commencement of his pension. Coverage shall take effect on his retirement date.

Likewise, the 1988 Summary Plan Description advised workers:

> If you retire and are eligible for the immediate receipt of a pension (with at least 5 years of credited service) under the Non-Contributory Pension Plan, you will be eligible for the Retired Medical Benefit Plan, continued at not cost to you . . . . If an active employee dies when eligible to retire or if a retired employee dies, the surviving spouse will have coverage for his or her lifetime at no cost to the survivor.

---

[5]A retiree health insurance benefits plan is a welfare benefit plan under ERISA. *Maurer*, 212 F.3d at 914. If parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a Labor-Management Act violation. *Id.*

This language cannot be reasonably interpreted to explicitly state that benefits vested as soon as a worker became eligible for a pension or to retire.  The phrase "shall be provided" in the Group Insurance Plan refers to "retired employees,"—not to current employees who might retire in the future.  Eligibility for retiree medical benefits is assessed "at [the worker's] retirement," and coverage takes "effect on his retirement date."  And though the Group Insurance Plan does not explicitly "link the end of the offer of the retirement plan to the end of the CBA," *Winnett*, 496 F. Supp. 2d at 918, the benefits for retirees are "the same benefits provided in [the Group Insurance Plan] as if they were Employees."  The only plausible interpretation is that the benefits offered to a worker who retired at a particular date were the "same" as those in place for active workers on that date.  Moreover, the Summary Plan Description promises that a worker "will be eligible for the Retired Medical Benefit Plan," "if [the worker] retire[s]," not if he becomes eligible to retire.

True, the Insurance Plan Agreement remains effective "until amended," and its termination  "shall not have the effect of automatically terminating the Plan."  But just because benefits offered by the Group Insurance Plan *may have* continued until it was properly amended, does not mean that the benefits became unalterable as soon as Plaintiffs became eligible to retire.  The provision contemplating an extension of the Group Insurance Plan has nothing to say about when retiree medical benefits vest, and certainly does not support an interpretation that the right to retiree benefits vests before an employee retires.  And as Plaintiffs concede, federal labor law permits an employer to unilaterally implement its last best offer once it has reached impasse in bargaining.

Moreover, the 1988 Summary Plan Description provides: "Subject to the applicable collective bargaining agreements, the company reserves the right to terminate the employee benefit Plans."  Although reservation-of-rights language may be ineffective as to workers who have already retired under the plan, "as to future retirees, it alerts them that the company may discontinue the retirement benefits of employees *who have yet to retire* when the agreement ends." *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 425 (6th Cir. 2004).

The district court found persuasive the contract language linking retiree medical benefits to pension eligibility, which we have held to be evidence of vesting. *Yolton*, 435 F.3d at 580; *McCoy*, 390 F.3d at 422 (6th Cir. 2004); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996). But in each of those cases, we found the link between pension and welfare benefits to support the conclusion that retiree medical benefits vested upon *actual* retirement, not when a worker attains retirement-eligibility.

In the context of collective bargaining, there is a fundamental difference between future retirees and actual retirees that flows from the fact that active employees are represented by a union, while retired workers are usually not.   As the Supreme Court recognized:

> [F]uture retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining. . . . [Active employees] are free to decide, for example, that current income is preferable to greater certainty in their own retirement benefits or, indeed, to their retirement benefits altogether.

*Allied Chem. & Alkali Workers of Am., Local Union No. 1. v. Pittsburgh Plate Glass Co.*, *Chem. Div.*, 404 U.S. 157, 180-81 (1971). The difference in status between a worker eligible to retire and a retired worker is a matter of the worker's choice about how long to work. When a particular collective bargaining agreement is about to expire, eligible workers are "free to decide," *id.* at 181, whether to continue to earn income or to accept the retirement benefits offered to them under the particular agreement.

The district court was concerned that if "Caterpillar could induce workers to provide years of faithful service to the company, with the promise of lifetime free medical benefits, and then unilaterally decide not to provide them, even after the worker had performed the requisite service and attained pension or retirement eligibility status" that promise would be "illusory." But we are not troubled by a collective bargaining process that enables workers to balance the certainty of particular retirement benefits against the potential to keep earning money, while accepting the risk that a future collective bargaining agreement's retirement benefits may not be as favorable.

Indeed, on several occasions we have recognized the difference between retired workers and those who are still represented by a union in considering whether retirement benefits vest upon retirement. For example, in *Yolton*, we observed that, "the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself." 435 F.3d at 581. Plaintiffs here were not retired; they were "contemplating retirement," when the 1988 Collective Labor Agreement expired—and therefore were within the category of workers whose retirement package, we explained, "will change with the expiration" of their collective labor agreement. *Id.*

The distinction between active and retired workers also explains why the *Yard-Man* inference does not apply here. In *Yard-Man*, we stated that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an *inference* . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." 716 F.2d at 1482 (emphasis added). We explained that "it is unlikely that [life and health insurance benefits], which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Id.* We further observed that if active workers "forgo wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements." *Id.* But we distinguished between retiree benefits "which have already vested in particular individuals" and non-vested retirement benefits, which "the union may choose to forgo . . . in future negotiations in favor of more immediate compensation." *Id.* at 1482 n.8.

The inference in *Yard-Man*, and in all of our cases that consider its applicability, is based on the fact that the plaintiffs had achieved retiree status by the time the employer attempted to change retiree benefits. *See, e.g., UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (identifying single question as whether "collective-bargaining agreements vest former union workers with their healthcare benefits upon

retirement . . .”). That is not the case here because, as set out above, the 1988 Collective Labor Agreement expired before Plaintiffs retired. So it makes little sense to apply *Yard-Man* to a contract that expired while workers were still represented by their union. Of course, an employer and a union could agree to provide retiree medical benefits that vest upon retirement or pension-eligibility by writing explicit language into the contract. But the 1988 Collective Labor Agreement here is silent on that point. And it carries no inference that the benefits described in it would last beyond its expiration for workers who chose to continue to work. It therefore cannot reasonably be interpreted to mean that retiree medical benefits vested before a worker became a "retired employee."[6]

## C.

Plaintiffs urge us to not to reach the merits of the vesting question without the benefit of extrinsic evidence that may turn up during further discovery. But "[e]xtrinsic evidence may not be used if the terms of a contract are unambiguous." *Yolton*, 435 F.3d at 591. And "to show material ambiguity in the language of a plan, the competing interpretation must be a plausible one." *Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 287 (6th Cir. 2008). Because when considered "as part of the integrated whole," *Yolton*, 435 F.3d at 579, none of the language here could be reasonably interpreted to vest a right to retiree medical benefits at the point when a worker becomes eligible for a pension or to retire, we cannot consider extrinsic evidence, *id.* at 593.

Nonetheless, we observe that much of the extrinsic evidence upon which Plaintiffs rely is irrelevant to when a worker's right to retiree medical benefits vests. This includes Caterpillar's written assurances to surviving spouses, because, as Plaintiffs concede, surviving spouse claims are not the subject of this interlocutory appeal. And we do not need extrinsic evidence to determine how long the 1988 Insurance Plan

---

[6]There are fundamental differences between this case and those few cases where this Court has found that retiree medical benefits vested upon eligibility for retirement. *See UAW v. Park-Ohio Indus., Inc.*, 1989 WL 63871, at *6 (6th Cir. June 15, 1989) (reversing the district court's finding that the language describing that benefits would be available to "future retired employees" unambiguously covered workers retiring after the expiration of a collective bargaining agreement); *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1292-93, 1297 (6th Cir. 1991) (concluding that workers who retired on the day that a plant closed were entitled to retiree medical benefits).

Agreement and Group Insurance Plan may have continued past the November 3, 1991 expiration of the 1988 Collective Labor Agreement.  Our decision that Plaintiffs' right to retiree medical benefits did not vest before they retired does not require us to answer that question.  Nor do we decide how, if at all, Caterpillar's alleged failure to issue a successor summary plan description until 1999 affects Plaintiffs' claims.  Finally, we recognize that some of the subclasses, including those workers under the separate Caterpillar Logistic Services Agreement, or surviving spouses may have claims that are based on separate contractual provisions and distinct facts not before us in this appeal.

## IV.

We REVERSE the district court's decision that Plaintiffs' right to retiree medical benefits vested at the point when they "attained retirement or pension eligibility" even though they continued to work past the date that the 1988 labor contracts expired.  On remand, the district court should dismiss Plaintiffs' claims which depend exclusively on the theory that retiree medical benefits vested before retirement.

―――――――――――――

**CONCURRENCE**

―――――――――――――

ROGERS, Circuit Judge, concurring. I concur in all but Part II.A. of the majority opinion. Part II.A. answers a question that does not need to be answered to decide this appeal. We should not answer such a question no matter how clear the answer appears to be. *See* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1255-56, 1261-63 (2006).

This case involves none of the situations in which it might make a difference whether or not the requirements of LMRA § 301(a) are jurisdictional. This is not a case where the requirements of § 301 have been forfeited, waived, or belatedly raised. Nor is this a case involving pendent state-law claims.

The res judicata effect of our decision is also not affected by the analysis in Part II.A. And, finally, this is not a case where we are formally required to ascertain our jurisdiction before ruling on a merits issue. Part II.A. instead resolves how we characterize a threshold issue, where the characterization has no effect either on how we decide the appeal or on the res judicata effect of our judgment. The characterization only makes a difference in fact situations not before us.