**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0463n.06

**No. 12-5801**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CHARLES CURTIS, et al., | ) | |
| | ) | **FILED** |
| Plaintiffs-Appellants, | ) | *May 09, 2013* |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| ALCOA, INC., | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF TENNESSEE |
| and | ) | |
| | ) | |
| ALCOA, INC., as Fiduciary of the Employees' | ) | |
| Group Benefits Plan of Alcoa Inc., Plan II, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: COOK, WHITE, and DONALD, Circuit Judges.

COOK, Circuit Judge. Charles Curtis, representative of a class of retired Alcoa, Inc. and Reynolds, Inc. employees ("Retirees"), appeals an adverse judgment on their claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002 *et seq.*, and the Labor Management Relations Act, 29 U.S.C. § 141 *et seq*. Following a bench trial, the district court denied Retirees' claims for lifetime, uncapped retiree-healthcare benefits. We AFFIRM.

I.

Between June 1993 and June 2006, appellants retired from Alcoa and Reynolds (collectively, "the companies") under collective bargaining agreements (CBA) jointly negotiated between the companies and appellants' unions, the United Steelworkers of America (USW) and the Aluminum, Brick and Glass Workers International (ABG).

Under the parties' 1988 CBA that expired in 1992, the companies provided lifetime, uncapped retiree-healthcare benefits. As the expiration date of the CBA approached, two factors fueled an increase in the companies' total retiree-healthcare costs: First, higher payments to healthcare providers. Second, a new public accounting obligation, Financial Accounting Standard 106 (FAS 106), that required public companies to recognize a liability for the present value of all projected retiree-healthcare costs, rather than including these costs on the company's balance sheet on a pay-as-you-go basis. *See Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 428–29 (6th Cir. 2010). Facing these mounting healthcare costs, the companies focused on negotiating an annual healthcare-contribution limit, or "cap," on retiree-healthcare benefits into the next CBA. (R. 523, Findings of Fact & Conclusions of Law [hereinafter "F&C"] at 7 ¶ 14.)

Disputes over proposed healthcare changes and caps stalled agreement on a new CBA. The parties extended the 1988 CBA for one year, until May 31, 1993, and negotiations continued. A "top-table" team comprising representatives from Alcoa, Reynolds, the USW, and the ABG negotiated wage and benefit issues including the cap agreement. Capped benefits remained a point of contention, causing negotiations to break down throughout the year, even after the companies

proposed delaying the cap's implementation. With less than a month before the extended CBA's expiration, the unions proposed deleting the healthcare cap. The companies, however, countered with a quid pro quo: enhanced retiree pensions in exchange for agreement to a retiree-healthcare benefits cap.

Despite the one-year extension, the 1988 CBA expired before the parties agreed to a new CBA. Union workers began striking, while the parties continued negotiations. They reached agreement several hours into the strike. The new CBA (the "1993 CBA") incorporated the companies' proposed trade-off; in exchange for enhanced pensions and 401(k) benefits, and mandatory bargaining over the amount of the cap during the next CBA negotiation, the unions agreed to include a deferred cap on retiree-healthcare benefits. The 1993 cap, memorialized in a letter ("cap letter"), set the companies' annual retiree medical contributions at 1997 expense levels, assigned any additional costs to retirees, and deferred implementation until January 1, 1998. The unions executed separate CBAs with each company, but agreed to the same written caps with Alcoa and Reynolds. Alcoa published the cap letter with its 1993 CBA. Reynolds did not, but the parties prepared collectively bargained summary plan documents—incorporated by reference into the companies' CBAs—that disclosed and described employees' capped retiree-healthcare benefits.

During the 1996 CBA negotiations, the unions again proposed removing the cap agreement. The companies rejected this proposal, but agreed to defer implementing the cap until after the 1996 CBA expired in exchange for the unions accepting reduced wage increases. The 1996 cap letter

fixed the companies' annual retiree-medical contributions at 2002 healthcare expense levels and assigned any above-cap healthcare costs to retirees. The parties memorialized these terms in the written plan documents, summary plan documents, and a letter to employees.

In 1997, the ABG merged into the USW (after 1997, "the Union"). In 2000, Alcoa bought Reynolds and assumed Reynolds's retiree-healthcare obligations. Heading into the 2001 CBA negotiations, Alcoa understood that it could defer the cap's implementation only one final time and still report it as "capped" for FAS 106 accounting purposes. Although the Union again proposed eliminating the cap, Alcoa sought to implement it, or defer it once more in exchange for instituting retiree premiums for their healthcare benefits. After negotiations, Alcoa withdrew its proposal regarding retiree premiums and agreed to defer the cap's implementation until January 2007, with mandatory bargaining preceding its implementation. The 2001 cap agreement set Alcoa's annual retiree-medical contribution at June 1, 2006 healthcare expense levels, apportioned excess healthcare costs among the retirees, and set implementation for January 1, 2007.

In 2006, the top-table negotiated the mechanics of the cap's implementation. The cap, once implemented, would limit Alcoa's per-capita contributions to $7,767 annually for pre-Medicare retirees and $2,334 annually for post-Medicare retirees, apportioning additional healthcare costs among retirees. The parties also made plan changes that the 2001 cap agreement did not require. The Union requested that retiree premiums begin immediately to help balance retirees' premium payments over the course of the CBA. Also at the Union's urging, Alcoa agreed to pay its total

capped healthcare contribution annually, even during years when retiree-healthcare costs fall below this limit. During years when the capped amount exceeds plan costs, Alcoa credits the difference between the cap and costs to a notional account designed to offset Retirees' future healthcare payments. To seed the notional account, Alcoa agreed to a one-time fixed contribution of $30 million and future contributions of at least $20 million. Medicare Part D reimbursements and Retiree premiums also fund the notional account, which Alcoa's actuaries expect to remain solvent and offset retiree medical costs until 2017. The cap took effect on January 1, 2007.

Retirees sued Alcoa for ERISA and LMRA violations, arguing that they possessed vested, *uncapped* lifetime retiree-healthcare benefits that Alcoa illegally reduced through illusory cap agreements. The district court disagreed, finding that (1) their retiree healthcare benefits vested at retirement, subject to the caps; (2) the cap agreements had legal effect and were not "sham" agreements intended only to disguise the companies' FAS 106 reporting obligations; and (3) the 2006 CBA properly implemented the 2001 cap agreement. The court also denied Retirees' requests for equitable and declaratory relief and struck portions of their expert actuary's testimony. Retirees timely appealed.

II.

*A. Vesting of Retiree Healthcare Benefits*

At the district court, the Retirees argued that they possessed lifetime, uncapped retiree-healthcare benefits that vested *before* retirement, rendering the benefit cap in place *at* their retirement inapplicable. "Questions of contract interpretation are generally considered questions of law subject to *de novo* review." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). When the district court holds a bench trial and evaluates extrinsic evidence, its "[f]indings of fact with regard to the extrinsic evidence [necessary to a contract's interpretation] are accorded the benefit of the clearly erroneous standard of review." *Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585, 589 n.7 (6th Cir. 1989).

This court does "not infer an intent to vest [retiree medical] benefits in the absence of explicit contractual language or, in the case of ambiguous contract language, extrinsic evidence indicating such an intent." *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1008 (6th Cir. 2009). Otherwise, "[u]nder this circuit's precedents . . . health care benefits vest at the point of retirement." *Wood v. Detroit Diesel Co.*, 607 F.3d 427, 432 (6th Cir. 2010) (citing *Winnett*, 553 F. 3d at 1010–11; *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 n.8 (6th Cir. 1983)). This rule exists because "'the union owes no obligation to bargain for continued benefits for retirees' and . . . it would be unfair to allow future agreements between the employer and the union to reduce the pension benefits of retirees when neither the union nor the employer is required to represent the retirees. *Id.* at 434 (quoting *Yard-Man*, 716 F.2d at 1482).

1) The Surviving-Spouse Benefit

To prove pre-retirement vesting, Retirees first point to the surviving-spouse benefit, which allows an "active employee [upon death to] pass retiree healthcare benefits to a surviving spouse for life prior to actual retirement or retirement eligibility" as support for "one conclusion—that pre-retirement . . . vesting [of retiree-healthcare benefits] was the logical intent of that language." (Appellant Br. at 21 (emphasis omitted).) The district court, citing this court's decision in *Winnett*, rejected this argument. *Winnett* involved a similar surviving-spouse benefit and this court held that it "cannot be reasonably interpreted to *explicitly* state that benefits vested as soon as a worker became eligible for a pension or to retire." *Winnett*, 553 F.3d at 1009 (emphasis added). The surviving-spouse benefit at issue in *Winnett* read:

> If you retire and are eligible for the immediate receipt of a pension (with at least 5 years of credited service) under the Non-Contributory Pension Plan, you will be eligible for the Retired Medical Benefit Plan, continued at not [sic] cost to you. . . . If an active employee dies when eligible to retire or if a retired employee dies, the surviving spouse will have coverage for his or her lifetime at no cost to the survivor.

553 F.3d at 1009. Here, the surviving-spouse benefit read, "You are eligible to participate in the Hourly Retiree Medical Program if you are a[]: . . . [s]urviving spouse of an active, fully vested employee who dies on or after January 1, 1994." (R. 565-2, PTE 2, 1993 Health Care Agreement Summ. Plan Doc. at 33.) This benefit is no more explicit than the surviving-spouse benefit found *not* to establish pre-retirement healthcare vesting in *Winnett*. The surviving-spouse benefit springs from the employee's death; it does not transfer the deceased employee's *already-vested* retiree-medical benefits to the surviving spouse.

Testimony of Alcoa's senior labor and benefits counsel, Nicolaas Storm, cements this point. Asked to explain how a surviving spouse of a pension-vested employee could receive retiree medical benefits, Storm explained: "The surviving spouse would have his or her retiree medical benefits, not the—not the [deceased] employee's. And as I previously stated, that's because the surviving spouses are eligible for pre-retirement *survivor* benefits under the plan." (R. 497, Trial Tr. Vol. 13 at 106:22–107:1 (emphasis added).) Storm's testimony supports the view that a surviving spouse, upon the death of an employed spouse, receives his or her own, separate, collectively bargained-for survivor benefit.

Retirees also interpret several references to "active vested employees" in the healthcare summary plan documents as proof that all employees's retiree-medical benefits vested before retirement. These healthcare summary plan documents, however, use the phrase "active vested employees" to describe a spouse's eligibility for the surviving-spouse death benefit; the phrase appears nowhere else in the retiree-medical eligibility guidelines. (*See, e.g.*, R. 565-2, PTE 2, 1993 Health Care Agreement Summ. Plan Doc. at 33; R. 565-5, PTE 5, 1996 Health Care Agreement Summ. Plan Doc. at 33.) The court thus properly found that the phrase did not evince the parties' intent to vest employees' retiree-medical benefits before retirement. We find no error in the district court's decision.

2) Benefits Documents

Retirees next point to various benefits documents as proof that retiree-healthcare benefits vested pre-retirement. They claim that the district court "apparently ignored" a 1992 document mentioning "active employees . . . who have 'vested' in the retiree medical benefit." (Appellant Br. at 20 (emphasis and internal quotation marks omitted) (citing R. 572-11, PTE 181, Oct. 20, 1992 Allocation Mem. at 160–61).) Instead of ignoring the document, the court noted that the document only uses "'vested' [a]s a term of art under FAS-106 that refers to vesting in the 'accounting sense, not the legal context.'" (R. 523, F&C at 27 ¶¶ 87–88.) Although the district court appears to have interpreted only a portion of the 1992 document, the document on the whole aligns with the court's analysis. This 1992 document addresses internal cost-assignment methods that Alcoa would employ under FAS 106. It states, "Alcoa will be required to implement the requirements of [FAS] 106, 'Employers' Accounting for Postretirement Benefits Other Than Pensions,'" and "describe[s] the new method to be used to assign costs to your location/business unit and to give you an idea of what your 1992 retiree benefit charge would have been under the new methodology." (R. 572-11, PTE 181, Oct. 20, 1992 Allocation Mem. at 1.) Importantly, FAS 106 aimed to quantify and disclose a company's possible future liabilities by "prevent[ing] employers from falsely assuming that they will cease offering retirement benefits to workers who retire in future years merely because those workers *are not yet entitled to vested benefits*." *Wood*, 607 F.3d at 433 (emphasis added). Because Alcoa's 1992 memo merely projected possible retiree-medical expenses, it does not establish that Retirees already possessed vested retiree-medical benefits.

Retirees next use the pre-retirement vesting of employee pensions as support for pre-retirement vesting of retiree-healthcare benefits. They first rely on a retirement-benefits booklet and accompanying testimony about pension-plan vesting to make their point. (Appellant Br. at 19 (citing R. 574-33, PTE 286; R. 487, Trial Tr. Vol. 3 at 70:15–24).) But the booklet's plain language only concerns pension-plan benefits. (*See* R. 574-33, PTE 286 at 79 (defining "Vested Pension").) Furthermore, a witness for the Retirees identified the document as a pension document. (*See* R. 491, Trial Tr. Vol. 7 at 131:8 (identifying PTE 286), 133:15–16 ("Every page I'm scanning and looking at, it seems to be related to the pension, yes, sir.").) This evidence demonstrates that *pension* benefits could vest before retirement, but says nothing of retiree-medical benefits vesting before retirement. A fair reading of the CBAs confirms this interpretation. For example, the 1986 CBA differentiates between medical benefits available to active employees, and those for "*retired* employees . . . *who are receiving a pension under the Pension Agreement.*" (R. 574-34, PTE 287, 1986 CBA at 98 (emphasis added).) The CBA just explains the healthcare benefits available to active and retired employees, while establishing pension eligibility as a precondition for receiving retiree-healthcare benefits. As this court recently explained:

The difference in status between a worker eligible to retire and a retired worker is a matter of the worker's choice about how long to work. When a particular collective bargaining agreement is about to expire, eligible workers are "free to decide" whether to continue to earn income or to accept the retirement benefits offered to them under the particular agreement.

*Winnett*, 553 F.3d at 1010 (citation omitted). The statements in Alcoa's CBA thus do not vest pension-eligible employees' retiree-medical benefits pre-retirement; they concern pension-eligible employees deciding whether to retire. (*See* R. 565-9, PTE 9, 1993 CBA at 63; R. 576-1, DX 13, 1996 CBA at 55; R. 575-5, DX 18, 2001 CBA at 53 (similar language in other CBAs).) Thus, we discern no error in the district court's decision on this point.

*B. Purpose of Cap Agreements*

Retirees next challenge the caps as sham "accounting devices never intended to be implemented against the Retirees." With its summary judgment, the district court ruled that "the cap letters unambiguously allowed Alcoa to implement health care caps as early as 1997, ten years before their actual implementation." (R. 392, Mar. 19, 2009 Mem. & Order at 7.) But because it found "material issues of fact as to whether Alcoa and the Union had an oral agreement that the cap agreements would never be implemented against the plaintiff retirees," the lawsuit proceeded to a bench trial. (*Id.* at 13.) After trial, the district court found that "the evidence . . . overwhelmingly supports the conclusion that the parties understood the cap to be real." (R. 523, F&C at 88 ¶ 261.) Retirees contest that finding, arguing that the district court misinterpreted the available evidence.

Specifically, Retirees dispute the court's determination that all parties acknowledged the reality of the caps by actually bargaining over implementing them during the 1993, 1996, and 2001 CBA negotiations. Yet, as Alcoa argues, Retirees offer no plausible explanation for why—if the caps were shams—they repeatedly proposed deleting them in their collective bargaining. Likewise,

the bargaining history confirms that the Unions insisted that the caps be the subject of future collective bargaining. Our review of the record confirms that both sides received concessions for deferring the cap. For example, Retirees received enhanced pension and 401(k) benefits for first agreeing to the deferred cap in 1993. And in 1996, to delay the cap's implementation, the Unions accepted reduced wage increases. This negotiation history confirms the district court's finding that the caps were in fact real.

Retirees also argue that the parties never intended to implement the cap agreement because the Reynolds cap letters were placed in a confidential file instead of being published in the 1993 and 1996 CBAs. But, as Alcoa points out, the clear language of the Reynolds cap letters allowed implementation. (*See, e.g.*, R. 566-5, Reynolds 1993 Cap Letter at 1; R. 577-3, Reynolds 1996 Cap Letter at 1 (Reynolds shall "maintain its program of medical benefits for post May 31, 1993 retirees").) Furthermore, the district court found that Reynolds union members learned of the cap through summary plan documents, union presentations to members, and informational materials provided by Alcoa that disclosed the cap. (R. 523, F&C at 20, 23, 35, 37 ¶¶ 63, 74, 108, 115.) Retirees offer no evidence contradicting the court's findings that, regardless of the Reynolds cap letters not appearing in the 1993 and 1996 CBAs, the Reynolds employees learned of the caps through the summary plan documents and informational meetings.

Nor does the parties' recurring use of the phrase "caps with a wink" prove that the parties regarded the caps as shams. Having heard eighteen witnesses testify during the eight-day trial, the

district court found that "with a wink" referenced the understanding about deferral; that is, the parties repeatedly negotiated deferred implementation. The bargaining history supports this interpretation. Each cap letter delayed implementation until the expiration of the current CBA. Eventually, the parties implemented the cap, as the cap letters foretold. Retirees fail to show clear error in the district court's findings.

Retirees next compare the length and complexity of the 2006 cap letter (implementing the cap) to the 1993 and 2001 cap letters (deferring the cap), arguing that the earlier letters' simplicity reflects the sham nature of the agreements. But the earlier letters postponed negotiation of cap-implementation details. The detail and specificity appearing in the 2006 cap letter evidences the results of the postponed negotiation.

Retirees point to a document, titled "The retiree medical cap: Is it really an 'accounting scheme?'" as evidencing that both Alcoa and the Union viewed the cap letters as a sham. But the document explains that the cap is not an accounting scheme, that both parties agreed to the cap in 1993, 1996, and 2001, and that "[i]n the past, Alcoa didn't start the cap because the financial impact could be absorbed in different ways." (R. 572-18, PTE 188.) It concludes by listing other USW companies with capped retiree-healthcare benefits. The document shows only the employer's serious attempt to dispel rumors surrounding the cap's impending implementation.

Retirees press this court to credit the perceptions of John Murphy, a top-table Union negotiator during early cap negotiations (1993, 1996, and 2001), that "[i]f Alcoa had ever mentioned

that it planned on implementing a cap, [he] would have initiated a strike." (Appellant Reply Br. at 7.) But the court found that Murphy "was unable to identify any explicit statement by either Company that the cap would never be implemented." Further, Jim Robinson, the Union's top-table negotiator in 2005 and 2006, undercut Murphy's testimony. Robinson testified that both he and the Union expected the cap to be implemented, explaining that "union members may have expected the cap to move and somehow that expectation had morphed into a belief or claim that the Company had made a commitment not to engage the cap." (R. 523, F&C at 53–54 ¶ 163.) But "that was not the case." (*Id.*) Robinson's contradicting testimony and Murphy's absence from the top-table during the 2006 implementation negotiations thwart Retirees' efforts to prove clear error.

Retirees also rely on an e-mail relaying that Alcoa's Director of Benefits *may* have told another employee that the company expressed to the Union that the cap was for accounting purposes. The e-mail stated, "I'm not sure if [the employee] interpreted [the Director of Benefits] correctly or not. You may want to touch base with [the director] and find out." (R. 567-15, PTE 89.) The district court properly discounted it as speculative and of no help improving the Retirees' position.

Finally, Retirees criticize the court's use of *Wood v. Detroit Diesel Corp.*, 607 F.3d 427 (6th Cir. 2010), because that case did not hinge on the evaluation of extrinsic evidence. Yet here, it was at the Retirees' urging that the district court considered extrinsic evidence. The court allowed Retirees to present this evidence, despite having decided that Alcoa could have implemented the cap in 1997. (*See* R. 392, Mem. & Order at 7 (finding "the cap letters unambiguously allowed Alcoa to

implement health care caps").) Having invited the court to rely on extrinsic evidence, Retirees cannot now discredit its use of *Wood*.

*C. Implementation of Cap Agreements*

As an alternative argument, Retirees argue clear error in the court's determination that the cap agreements were properly implemented, claiming that the 2006 healthcare benefits were less favorable to them than what was called for in the 2001 cap agreement. These changes, they argue, constituted an impermissible change in benefits from their prior plan under *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009). In *Reese*, plaintiffs retired under a CBA without a managed care plan. When the company negotiated the next CBA, it imposed a managed health care plan on all retirees despite the fact that prior retirees' healthcare benefits vested under a CBA without a managed health care plan. The court reviewed the CBA and the parties' course of dealing before deciding that the company "cannot terminate all health-care benefits for retirees, but it may reasonably alter" retirees' vested lifetime healthcare benefits. *Id.* at 327.

But *Reese* does not help the Retirees because the type of retirement benefit differs. The *Reese* employer sought to modify retiree healthcare benefits that vested without managed care; switching to managed care surprised those retirees. *Id.* at 324–25. Here, however, the Retirees consented to, and retired under, CBAs that deferred healthcare-benefit caps. By its nature, a deferral

contemplates eventual implementation—not the surprise that drove *Reese*. *See Reese*, 574 F.3d at 324 ("The [prior] retirees were not asked to consent to this change, and they did not consent to it. And as *Yard-Man* makes clear and as later cases confirm, a union does not represent retired employees when it bargains a new contract for its employees."). Retirees benefitted from delayed cap implementation, but the delay did not eliminate the cap.

The Retirees "do not contest Alcoa's ability to make reasonable administrative changes . . . as long as Alcoa continues to provide them with benefits 'reasonably commensurate' with what they had in the previous plan." Each member retired under a capped CBA (1993, 1996, and 2001) that called for the pre-implementation negotiations that produced the specific 2006 (cap implementing) plan Retirees now challenge. And these negotiations proved fruitful; they produced a benefit package "more favorable to the retirees than a package that simply implemented the 2001 cap would have been." (R. 523, F&C at 96 ¶ 280.) Significantly, after the 2006 changes, Retirees pay less in premiums than they would have had Alcoa implemented the 2001 agreement without modification. (*Id.* at 64–65 ¶ 199.) When Alcoa spends less annually on retiree healthcare than the pledged cap amount, it credits the difference between its healthcare expenditures and the cap to the notional account, carrying the balance forward to offset retirees' future healthcare costs. (*Id.* at 98 ¶ 286.) Alcoa pledged at least $50 million to the notional account under the 2006 CBA, an obligation not imposed by the 2001 CBA. (*Id.*) The account enables the Retirees' modest premiums to remain in place until at least 2017, when "virtually all of [the] plaintiffs will be eligible for Medicare and subject only to very modest supplementary plan costs." (*Id.* at 100 ¶ 288.) Similarly, the Retirees'

immediate payment of premiums, before Alcoa's costs reach the cap, minimizes the likelihood of spikes in Retiree-premium payments. The district court did not err by finding that Alcoa properly implemented the cap. Alcoa did so in a manner that both stabilized and offset Retirees' total healthcare costs for a longer period.

Retirees also challenge, for the first time in their reply brief, the method the court used to value Alcoa's cap contribution. They argue that by "finding that the correct valuation of the plan was a capped plan throughout, the District Court committed clear error." The court clearly set forth its cap-valuation findings (*see* R. 523, F&C at 61–64, ¶¶ 190–98), yet having failed to raise the point in their opening brief, Retirees forfeit this argument. *See United States v. Madden*, 403 F.3d 347, 351 n.1 (6th Cir. 2005).

*D. Denial of Equitable & Declaratory Relief*

Retirees argue that the district court abused its discretion by failing to provide them equitable or declaratory relief. They request an injunction barring premium increases, reformation of the retiree medical plan, estoppel, and restitution. We review the denial of equitable relief for abuse of discretion, *Anchor v. O'Toole*, 94 F.3d 1014, 1025 (6th Cir. 1996), granting relief only if we have a "definite and firm conviction that the trial court committed a clear error of judgment," *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 569 (6th Cir. 2008) (internal quotation marks omitted).

1) Equitable Relief

Injunctive relief is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010). Courts grant permanent injunctions only when: (1) a plaintiff suffers irreparable injury, (2) an inadequate remedy exists at law, (3) the injunction is warranted in light of the "balance of hardships" between the parties, and (4) the public interest would not be disserved by a permanent injunction. *See id.* at 2756. Retirees, however, urge a different standard. They say that this case merits an injunction because Alcoa can unilaterally reduce their benefits at any time, without restriction. Even if such unfairness were a tenable standard, it is not factually true here. The cap's 2007 implementation fell outside the unlawfulness of *Reese* because Retirees got what was bargained for, as we explained. In the absence of evidence of a breach of the terms of the controlling CBA, the district court did not abuse its discretion by refusing to impose an injunction.

Neither can Retirees establish the right to reformation, estoppel, or restitution. This court reforms a contract upon finding "mutual mistake . . . or a mistake of one party induced by the other's fraud." *Bituminous Fire & Marine Ins. Co. v. Izzy Rosen's, Inc.*, 493 F.2d 257, 261 (6th Cir. 1974). Here, the district court found no evidence of mutual or fraud-induced mistake, and Retirees do not provide facts or argument compelling an opposite conclusion.

Nor do Retirees establish the prerequisites to estop Alcoa from denying "what it had promised to retirees." Estoppel generally requires (1) misrepresentation by the party against whom estoppel is asserted, (2) reasonable reliance on the misrepresentation, and (3) detriment to the party

asserting estoppel. *Mich. Express, Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004). Retirees have not shown that any member of their class meets this standard, and we therefore find no abuse of discretion in the court's refusal to estop Alcoa.

Retirees also argue that because Alcoa did not pay up to the cap level, they deserve restitution of the healthcare premiums, deductibles, and co-payments imposed above the 2001 CBA levels. (*See* Appellant Br. at 46 ("The Retirees are owed the difference between what Alcoa has actually paid and what it should have paid [to reach the cap level.]"), 47 ("The District Court erred in failing to grant equitable relief including reimbursements for premiums, deductibles, and co-payments imposed to Appellants above the 2001 CBA levels . . . .").) We find no error in the district court's determination that Alcoa did in fact pay up to the cap amount and that by creating and funding the notional account, and guaranteeing lump-sum payments to surviving spouses, the implemented cap agreement "imposed additional costs on Alcoa that Alcoa was not required to pay under the 2001 cap agreement." (R. 523, F&C at 62–65, 97 ¶ 283.) Accordingly, we reject Retirees' claim for restitution.

2) Declaratory Relief

Retirees also seek a "declaration that they had vested lifetime healthcare benefits" (Appellant Br. at 53) because the court's Judgment Order stated that Retirees "take nothing." (R. 524, J. Order at 1.) The court's Judgment Order did nothing more than deny Retirees the relief they requested—vested, lifetime, and *uncapped* healthcare benefits. The district court's findings and

conclusions clarified that Retirees possess lifetime health benefits: "In conclusion, the court finds that under the cap agreements . . . plaintiffs are entitled to *lifetime*, capped *healthcare benefits*." (R. 523, F&C at 100 ¶ 289 (emphasis added).)

*E. Exclusion of Expert Testimony*

Finally, Retirees argue that the district court erred by striking testimony of their actuarial expert, Ian Altman, from the trial's liability phase. We review the exclusion of expert testimony for abuse of discretion, *United States v. Cunningham*, 679 F.3d 355, 377 (6th Cir. 2012), mindful that in this area trial courts possess broad discretion and their decisions should "be sustained unless manifestly erroneous," *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir. 1977) (internal quotation marks omitted).

The court bifurcated the trial into liability and damages phases, confining evidence offered during the liability phase to "evidence to determine whether or not vesting has occurred" (R. 454, Aug. 12, 2009 Minute Entry at 1) and "mixed questions of liability and damages" (R. 523, F&C at 101 ¶ 291). Retirees maintain that Altman adhered to the court's limitation and only testified that "the [Retirees'] benefits were significantly reduced," without testifying about damages. (Appellant Br. at 57.) But Altman testified on direct examination that "participants are paying out millions of dollars" and "[u]ltimately, they will pay out 111 million." (R. 490, Trial Tr. Vol. 6 at 104:3–4, 6.) Altman confirmed the damages-related nature of this testimony on cross-examination. (R. 491, Trial Tr. Vol. 7 at 51:9 ("I'm not disagreeing" that $111 million is a damages figure).) The court then

sifted through Altman's damages-related testimony, admitting liability testimony and excluding

damages-related testimony. In doing so, the court acted well within its broad discretion. *See Green*,

548 F.2d at 1268.

III.

We AFFIRM.