NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0045n.06
Filed: January 17, 2007

No. 06-1157

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DANIEL WOOD, RONALD GOINS, and )
PRISCILLA SUE STREET, on behalf of )
themselves and a similarly situated class, )
)
    Plaintiffs-Appellees, Counter-Defendants, )
)
v. )
)
DETROIT DIESEL CORPORATION, )
) ON APPEAL FROM THE
    Defendant-Appellant, Counter-Plaintiff, ) UNITED STATES DISTRICT
    Third Party Plaintiff, ) COURT FOR THE EASTERN
) DISTRICT OF MICHIGAN
v. )
) **O P I N I O N**
INTERNATIONAL UNION, UNITED )
AUTOMOBILE, AEROSPACE, AND )
AGRICULTURAL IMPLEMENT WORKERS OF )
AMERICA and its LOCAL 163, )
)
    Third Party Defendant-Appellee. )

BEFORE: COLE and McKEAGUE, Circuit Judges; and BREEN, District Judge.*

**McKEAGUE, Circuit Judge.** This is an appeal from a preliminary injunction restraining

efforts by Detroit Diesel Corporation to require retired employees to make premium contributions

in order to maintain their current health care coverage. Although the district court's

_____

\* The Honorable J. Daniel Breen, United States District Judge for the Western District of Tennessee, sitting by designation.

reasoning is flawed, the award of preliminary injunctive relief has not been shown to be an abuse of discretion. For the reasons that follow, the preliminary injunction is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Employees who retired from employment with Detroit Diesel Corporation between 1993 and 2004 received continuing health care benefits pursuant to various collective bargaining agreements and related documents. The agreements were reached by Detroit Diesel with the employees' collective bargaining unit, International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, Local 163 ("UAW"). Pursuant to these agreements, Detroit Diesel continued to provide health care coverage to the retirees, but its annual premium contributions were, during the period 1993 to 2004, limited by so-called "Cap Agreements" to specific dollar amounts. Any "above-cap" costs of continuing coverage were to be paid in accordance with negotiated agreements between Detroit Diesel and the UAW. In furtherance of this purpose, from 1993 to 2004, Detroit Diesel and the UAW established a Voluntary Employee Benefit Association ("VEBA") Trust. The VEBA Trust was jointly funded by the parties and jointly administered by representatives of both parties. Changes in the manner of funding the VEBA Trust were to be resolved in collective bargaining.

In 2004, the VEBA Trust funds were exhausted and no substitute method of paying above-cap costs was agreed to by Detroit Diesel and the UAW. In August 2005, Detroit Diesel informed the retirees that, effective January 1, 2006, they would have to pay premium contributions in order

to cover the above-cap costs if they wanted to maintain their existing health care coverage. Depending on the coverage elected, this would entail individual monthly contributions of varying amounts, potentially as much as $834.

Plaintiffs Daniel Wood, Ronald Goins and Priscilla Sue Street, suing on behalf of themselves and a putative class of some 1126 similarly situated retirees and survivors, contend Detroit Diesel has no right to unilaterally modify or reduce their health care coverage by requiring them to make premium contribution payments. They filed suit in the Eastern District of Michigan, contending Detroit Diesel's actions: (1) are in violation of their rights under several collective bargaining agreements, actionable under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; and (2) represent the wrongful denial of employee welfare benefits, actionable under the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. They allege their health benefits are vested for life at no cost to them.

Plaintiffs asked the district court to preliminarily enjoin Detroit Diesel's wrongful requirement that they make premium contributions as a condition of continued coverage. Finding that plaintiffs had demonstrated a likelihood of success on the merits and that they would suffer irreparable harm if an injunction did not issue, the district court issued a preliminary injunction. Detroit Diesel appeals from this ruling, contending the district court abused its discretion. We have jurisdiction to hear the appeal from the interlocutory injunctive order under 28 U.S.C. § 1292(a)(1).

## II. ANALYSIS

### A. Standard of Review

The governing standards of review were recently summarized in *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 577-78 (6th Cir. 2006), as follows:

> This Court reviews a district court's grant of a preliminary injunction for an abuse of discretion. *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Id.* This Court reviews the district court's conclusions of law *de novo* and its findings of fact for clear error. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). "Questions of contract interpretation are generally considered questions of law subject to *de novo* review." *Id.*

> To determine whether to grant a preliminary injunction, a district court must consider: "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Golden*, 73 F.3d at 653.

## B. Likelihood of Success on the Merits

In order to succeed on the merits of their claims, plaintiffs must make the threshold showing that their asserted right to fully-funded lifetime health care benefits vested at some time prior to the attempted modification by Detroit Diesel. Again, *Yolton* provides a useful summary of the legal context for plaintiffs' claims:

> A retiree health care insurance benefit plan is a welfare benefit plan under ERISA. . . . . Unlike pension plans, "[t]here is no statutory right to lifetime health benefits." . . . . If lifetime health care benefits exist for the plaintiffs, it is because [the union] and [employer] agreed to vest a welfare benefit plan. . . . . If a welfare benefit plan has not vested, "after a CBA [collective bargaining agreement] expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to the CBA." . . . . If a welfare benefit plan has vested, the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation.

*Id*. at 578 (footnote and citations omitted). Thus, to show that their right to health care benefits vested, plaintiffs must show that the UAW and Detroit Diesel reached an agreement to that effect. In this regard, *Yolton* further instructs:

> Whether the benefits vest depends on the intent of the parties. . . . . "Courts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement." . . . . [I]n determining the intent of the parties to a CBA, "basic rules of contract interpretation apply." . . . . [C]ourts "should first look to the explicit language of the collective bargaining agreement for clear manifestation of intent." . . . . Moreover, "courts should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." . . . . When ambiguities exist, courts may look to other provisions of the document and other extrinsic evidence.

*Id.* (citations omitted). It follows that the first step in discerning the intent of the parties to the CBA requires examination of the language of the pertinent documents.

The district court examined the language of the pertinent documents. The court did not hold that the language evidenced an agreed intent to vest health care benefits. In fact, the court's opinion hardly even mentions the concept of vesting. The court concluded simply that because none of the CBA documents provided that retirees "would be required" to pay premium contributions, the requirement is facially improper. In its motion for reconsideration, Detroit Diesel pointed to language explicitly providing that retirees "may be required to make monthly contributions" and argued this language put employees on notice that their right to continuing health care benefits had not vested. Again, without even commenting on the threshold issue of vesting, the district court simply found this permissive language insufficient to support imposition of a requirement to pay premium contributions.

The district court's reasoning is faulty. The court implicitly applied a presumption that the retirees' right to health care benefits was vested and then required Detroit Diesel to rebut the presumption by identifying contractual language specifically authorizing the modification it tried to implement. Detroit Diesel correctly argues that such a presumption is improper, as the burden of proving intent to vest rests on plaintiffs. *Yolton*, 435 F.3d at 579-80. The district court failed to find that plaintiffs had demonstrated a likelihood that they will be able to carry this burden. The district court's analysis is therefore flawed as a matter of law. Nonetheless, its issuance of preliminary injunctive relief is not necessarily an abuse of discretion.

The matter of contract interpretation is a question of law which we review *de novo*. Plaintiffs insist they had a vested right to fully-funded health care coverage, but they do not identify CBA language that explicitly supports the argument. They point to language to the effect that "the health care coverages an employee has at the time of retirement . . . . shall be continued," and "the Corporation shall make contributions . . . . for health care coverages continued." These provisions support plaintiffs' claim, but fall short of evidencing an agreed intent to vest fully-funded lifetime health care coverage.

Plaintiffs contend the pertinent language is "UAW pattern contract language" which the Sixth Circuit has previously deemed sufficient to substantiate vesting – at least at the preliminary injunction stage. *See McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 422 (6th Cir. 2004); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996). Indeed, the determinations in both *Golden* and *Meridian* that the plaintiffs had made a sufficient showing of vesting to warrant preliminary injunctive relief were based in part on similar CBA language. In those cases, as here, the CBAs were

- 6 -

devoid of explicit vesting language, but contained provisions possibly supporting an inference of intent to vest. In each case, because the CBA language was inconclusive, the court was forced to look further, to summary plan descriptions (not available in this case) and other extrinsic evidence, to discern the parties' intent. Plaintiffs' assertion that *Golden* and *Meridian* confer a sort of judicial imprimatur on "UAW pattern contract language" is therefore too simplistic.

Detroit Diesel maintains there was no explicit agreement that retiree health care benefits vested. In fact, Detroit Diesel insists the provisions pertinent to retirees who retired from 1993 to 2004, set forth in Supplemental Agreements, expressly advised enrollees in the health care program that rates of payment, coverages, and terms and conditions of the program were all subject to change by Detroit Diesel at any time on reasonable notice. Further, enrollees were advised that they "may be required to make monthly contributions." These provisions are clear and unambiguous, Detroit Diesel contends, and demonstrate, without resort to any extrinsic evidence, that it retained the right to modify the terms of coverage and that there was no agreement on vesting.

In January 1993, moreover, Detroit Diesel contends that a critical element of its agreement with the UAW was memorialized in the Memorandum of Understanding on Retiree Health Care Benefits ("Cap Agreement"). Under the Cap Agreement, Detroit Diesel's obligation to pay premiums was limited to a sum certain per year for each eligible retiree. The Cap Agreement provided for establishment of the VEBA Trust, through which any above-cap premium costs would be paid. In consideration of the UAW's agreement to limit Detroit Diesel's liability for health care costs, Detroit Diesel affirmatively promised in writing, through Senior Vice President Paul F. Walters, that its capped responsibility for retiree health care coverage was a lifetime commitment:

> DDC fully recognizes, acknowledges and hereby confirms that retiree health care benefits for DDC/UAW employees have been and will continue to be life-time benefits and that the establishment of "contribution limits" in no way modifies or negates this commitment.

Walters letter Jan. 4, 1993, JA 308-09.

This written promise, Detroit Diesel concedes, supports a finding that plaintiffs' right to lifetime health care coverage was vested. However, Detroit Diesel insists plaintiffs' vested right must be deemed subject to the agreed-to contribution limits, which represented the *quid pro quo* for the express, enforceable lifetime commitment. Moreover, Detroit Diesel maintains that it retained the prerogative, pursuant to the Supplemental Agreements, to require retiree contributions for above-cap costs in the event the VEBA Trust failed or proved insufficient to cover the costs. In other words, although Detroit Diesel recognizes that plaintiffs have a vested right to lifetime health care coverage, it maintains they do not have a vested right to *fully-funded* health care coverage. Detroit Diesel thus argues that it is within its rights to require premium contributions from retirees and the preliminary injunction should be vacated.

In a case such as this, where the language of the pertinent documents is inconclusive, extrinsic evidence is an appropriate and important aid in construing the parties' contractual agreement. However, the available extrinsic evidence, like the Walters letter itself, cuts both ways.

The first Cap Agreement, entered into in January 1993, covered employees who retired in 1993 and 1994 and established Detroit Diesel's contribution limits for those retirees. The contribution limit for 1993 retirees was 110% of the 1992 average cost, or $6,710. The contribution limit for 1994 retirees was 110% of the 1993 average cost, or $7,381. Memorandum of

Understanding Jan. 7, 1993, JA 306-07. The Cap Agreement also set forth the manner of funding the VEBA Trust, requiring, for 1993, that Detroit Diesel contribute $200,000, and that the DDC/UAW Joint Training Fund contribute $100,000. *Id.* For 1994, Detroit Diesel and the Joint Training Fund each contributed $100,000.

In connection with the initial Cap Agreement, plaintiffs present several declarations attesting to the parties' understanding. James Brown and Robert King participated on behalf of the UAW in the negotiations that culminated in the initial Cap Agreement. In their declarations, they attest to having sought and obtained express assurances from company representatives that, despite the agreed-to contribution limits, Detroit Diesel would remain liable to provide lifetime health coverage and that retirees would never have to pay out-of-pocket for the benefits. Indeed, these assurances are confirmed in part by the Walters letter of January 4, 1993. The Walters letter stops short, however, of promising that retirees would never have to make premium contributions.

The Walters letter is consistent, though, with plaintiffs' position that it *had been* and would continue to be Detroit Diesel's responsibility to pay the health care costs. The letter not only acknowledges this pre-existing commitment, but also confirms that the Cap Agreement was not intended to modify or negate the pre-existing commitment in any way. The motivating purpose of the Cap Agreement was not to shift or share responsibility for health care coverage premiums between Detroit Diesel and the retirees. As the Walters letter makes clear, the purpose was to alter Detroit Diesel's method of funding health care coverage in order to meet the new accounting requirements of "Financial Accounting Standard 106" while simultaneously minimizing any negative impact of such accounting disclosures on its ability to attract investors. Furthermore, the Walters

letter acknowledges the mutual interest of Detroit Diesel and the UAW in controlling health care costs and the need for joint efforts to serve this mutual interest on an ongoing basis: "It is understood that both parties will begin work immediately to jointly develop innovative approaches to control the cost impact of health care on the corporation." Walters letter Jan. 4, 1993, JA 308-09.

Hence, this much is clear, based on the written assurances of Detroit Diesel's own Senior Vice President: (1) that Detroit Diesel had assumed exclusive responsibility for funding health care costs for pre-1993 retirees; (2) that Detroit Diesel had promised the UAW that the Cap Agreement would in no way modify this pre-existing commitment; (3) that the commitment to provide fully-funded lifetime benefits would continue; and (4) that Detroit Diesel and the UAW would cooperate in continuing efforts to control health care costs so as to minimize the burden on Detroit Diesel.

A second Cap Agreement was entered into in conjunction with the Detroit Diesel/UAW collective bargaining agreement covering the period 1995-1998. Memorandum of Understanding Aug. 26, 1994, JA 429. The 1994 contribution limit of $7,381 was continued for the ensuing four-year period. The method of funding the VEBA Trust was altered, however, requiring contributions totaling $1 million per year: $80,000 from Detroit Diesel; $420,000 from the Gross Profit Sharing Pool (with Detroit Diesel to cover any deficit); and $500,000 from the UAW Joint Training Fund. *Id.*

During negotiations of this agreement, plaintiffs contend Detroit Diesel made oral assurances that it would pay any shortfall if the VEBA Trust funds were insufficient to cover above-cap costs. These assurances are said to be substantiated by letter of Detroit Diesel Chairman and CEO Roger Penske dated August 26, 1994. The letter states:

> As discussed during the week of August 15, 1994 if the VEBA Trust asset level became insufficient to cover costs over the retiree premium level contribution amount, Detroit Diesel would make necessary adjustments to their contribution level to correct this situation so that there are no out of pocket costs for retirees.

Penske letter Aug. 26, 1994, JA 428. The letter is unsigned, however, and Penske denies ever signing such a letter or making any such assurances, written or oral. Penske dec. ¶ 9, JA 203-04.

Plaintiffs have been unable to produce a signed copy of the letter, but they maintain its contents are corroborated by the minutes of the parties' negotiations. The minutes do not substantiate the existence of a signed letter from Penske. Nor do they directly evidence oral promises, although they corroborate plaintiffs' argument that oral assurances were made. Significantly, though, the minutes do evidence ongoing collaborative exploration of different methods of funding continuing health care costs with an eye toward avoiding any need for retiree contributions.

A third Cap Agreement was reached in 1999 covering the period 1999-2004. This agreement is memorialized in a terse memorandum dated March 3, 1999. It provides simply that Detroit Diesel's existing contribution limit of $7,381 would continue until 2004 and that the VEBA Trust would be funded through annual $500,000 contributions from the Joint Training Fund.

By the time Detroit Diesel and the UAW entered into collective bargaining negotiations for the 2005-2010 period, Detroit Diesel had new ownership and management. Viewed from the perspective of the 1993-2004 retirees, the negotiations did not go well. Detroit Diesel and the UAW negotiated a CBA for active employees and post-2004 retirees, but no agreement was reached in relation to continuing health care benefits for the 1993-2004 retirees. According to Joseph Street,

UAW spokesperson in these talks, the UAW (1) rejected the company's proposal for substantial reductions in health care benefits for retirees; (2) failed to reach agreement on continuing the contribution limit; and (3) failed to reach agreement as to funding of the VEBA Trust. Street dec. ¶¶ 4-5, JA 112.

Thus, either Detroit Diesel or the UAW, or both, abandoned their ongoing contractual commitment to work together in maintaining continued health care coverage for the retirees while minimizing Detroit Diesel's health care costs. Absent the UAW's participation, something had to give. Either (a) Detroit Diesel's contribution limit had to be exceeded, or (b) health care costs had to be reduced, or (c) retirees had to be required to make premium contributions. Understandably, Detroit Diesel prefers one or a combination of the latter two solutions. Whether it is within its rights to unilaterally impose its preference on the retirees, however, is questionable.

In response to plaintiffs' extrinsic evidence, Detroit Diesel offers little in the way of factual rebuttal. Detroit Diesel correctly maintains that extrinsic evidence is ineffective to vary the clear and unambiguous terms of the Supplemental Agreements. The terms in the Supplemental Agreements, reserving to Detroit Diesel the right to change terms and conditions and even require monthly contribution payments, are said to be so clear and antithetical to vesting as to necessarily defeat any contrary inference that might arguably be drawn from extrinsic evidence of "understandings" and oral assurances.

But for the Walters letter of January 4, 1993, this argument might be more persuasive. The Walters letter contains representations which Detroit Diesel affirmatively asserts and stands on. By virtue of the letter, Detroit Diesel acknowledges that plaintiffs' right to lifetime benefits may well

have vested – but they are funded by Detroit Diesel only up to the capped contribution limit. The Walters letter is thus viewed even by Detroit Diesel as implicitly superseding the language of the Supplemental Agreements. If the right to lifetime benefits, derived from the letter, is to be enforced, Detroit Diesel contends, so must be its *quid pro quo* counterpart, the contribution cap. And if the cap is enforced, then, since the VEBA Trust was exhausted and the UAW did not agree to any other method of funding above-cap costs beyond 2004, Detroit Diesel contends it had no alternative but to (1) advise enrollees that its capped premium contributions alone will not sustain their existing health care coverage, and (2) give them the option of paying the shortfall or choosing reduced coverage.

As indicated above, however, the Walters letter says more. It also observes that Detroit Diesel's commitment to provide lifetime benefits to retirees pre-existed the first Cap Agreement. This concession, from the pen of Detroit Diesel's Senior Vice President, hints at a notion of vesting that pre-existed the first Cap Agreement. That is, the Walters letter also supports plaintiffs' argument that their right to lifetime health care benefits vested apart from any *quid pro quo* consideration for the UAW's agreement to the contribution cap. If their right vested independent of the Cap Agreements, then Detroit Diesel's argument for enforcement of the contribution cap beyond the durational terms of the Cap Agreements is undermined.

Moreover, and no less importantly, the Walters letter acknowledges that the Cap Agreement "fix" was temporary and conditioned upon the agreement of Detroit Diesel and the UAW to continue working toward other solutions to the quandary posed by ever-rising health care costs. That is, for the dual sake of providing quality continuing health care coverage to retirees and controlling the

impact of health care costs on Detroit Diesel, the company and the union were to continue to co-operate in jointly developing innovative approaches, including management of the funding needs of the VEBA Trust, through collective bargaining. Detroit Diesel's unilateral decision to cover the above-cap costs through retirees' premium contributions is not the product of cooperation. Its unilateral actions thus appear to be in breach of the condition upon which the contribution limit was premised.

Granted, it takes two to cooperate. Apart from the Street declaration, the record does not disclose the nature or specific cause of the breakdown in negotiations between Detroit Diesel and the UAW on behalf of the 1993-2004 retirees.[1] As a consequence of the breakdown and ensuing withdrawal of the UAW, however, the retirees—the third-party beneficiaries of the cooperative scheme that ushered in both the company's contribution limit and the company's explicit lifetime coverage commitment—were left vulnerable.

Detroit Diesel's unilateral actions to protect its interests take advantage of this vulnerability. The actions may ultimately be held legally justified. Still, viewing the record as a whole, including particularly the Walters letter, we conclude there are unresolved questions of fact going to the matter of vesting. These unresolved questions demonstrate that plaintiffs have "some likelihood" of success on the merits. It may not be a "strong" likelihood. Plaintiffs may have difficulty ultimately prevailing on the merits of their claims. Yet, considering the import of the Walters letter, as well

---

[1] We note that federal law does not impose a duty on the union to continue representing retirees. *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1484 (6th Cir. 1984). Arguably, though, such a duty arose contractually in this case, by virtue of the cooperative scheme established in the Cap Agreements.

as Detroit Diesel's part in the breakdown in cooperation which resulted in dissolution of the status quo, plaintiffs' likelihood of success is sufficient, when balanced in equity with the other relevant considerations, to warrant preliminary injunctive relief.

### C. Irreparable Harm/Balance of Harms

Detroit Diesel also challenges the district court's conclusion that plaintiffs would suffer irreparable harm if preliminary injunctive relief were denied. Citing *Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410, 415 (E.D. Mich. 1994), *aff'd* 73 F.3d 648 (6th Cir. 1996), the district court concluded that "reduction of benefits and imposition of additional insurance costs on retirees constitutes irreparable harm because of the financial hardship on retirees on fixed incomes, emotional distress and possible deprivation of life's necessities by reallocating scant resources to pay for much needed health care." Dist. ct. op. pp. 10-11, JA 26-27. Detroit Diesel contends the factual record relied on by the district court is too thin to justify class-wide preliminary injunctive relief.

Indeed, none of the three named plaintiffs has presented a factual showing of his or her own imminent irreparable harm. They have relied instead on declarations of five putative class members. Detroit Diesel also points out that even before the January 1, 2006 effective date of its attempted modification, some 100 of the putative class members had already elected the "cash-out" option, suggesting the modification may not be harmful to them at all.

Viewed in the traditional sense, the record evidence does not justify class-wide injunctive relief. Yet, a detailed showing of irreparable harm is not necessarily prerequisite to preliminary injunctive relief. *Golden*, 73 F.3d at 657. The possibility and severity of irreparable harm are among the factors which the court balances in assessing the appropriateness of injunctive relief. *Id*.

Moreover, evidence not unlike that presented in this case has been found sufficient by this Court to sustain preliminary injunctive relief in other similar situations. *See Yolton*, 435 F.3d at 584; *Golden*, 73 F.3d at 657. Indeed, the hardship, financial and emotional, that a new monthly expense of $260 to $834 would pose for most working class retirees hardly requires substantiation. In *Yolton*, this Court upheld the determination that a monthly premium contribution of $501 posed a sufficiently severe and irreparable hardship. The court quoted the district court's reasoning with approval:

> [T]he Court can surmise that the putative class members overall cannot afford to contribute such an amount until the case is resolved. Unable to afford the $501 premium, Plaintiffs will lose their health insurance, will not be able to pay for necessary prescription medications, and will not receive all of the medical care that they need. Reimbursing Plaintiffs for their contributions at the end of the case, therefore, will not afford them relief.

435 F.3d at 584. This reasoning is equally compelling in this case.

The impact of injunctive relief on Detroit Diesel is not insignificant. Detroit Diesel contends the injunctive relief costs it $600,000 per month. While this figure appears not to be substantiated in the present record, it can hardly be denied that the injunctive relief is expensive. Still, in view of Detroit Diesel's admitted historical commitment to paying the costs of retirees' health care benefits, as well as Detroit Diesel's partial responsibility for the failure to reach agreement on funding of above-cap costs through the VEBA Trust or otherwise, we conclude the district court's award of preliminary injunctive relief is not an abuse of discretion. *See Yolton*, 435 F.3d at 584; *Golden*, 73 F.3d at 657.

### D. Sufficiency of Bond Amount

Finally, Detroit Diesel contends the district court abused its discretion by requiring a security bond of only $1500 to support the preliminary injunction. It is well established in this Circuit that it is within the district court's discretion to require the posting of security or not. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). If the district court would have been within its discretion to require no bond at all, the requirement of a $1500 bond can hardly be held to constitute an abuse of discretion.

### III. CONCLUSION

Although the district court's opinion and preliminary injunction order are not well-reasoned, we nonetheless conclude, on *de novo* review of the legal issues presented, that plaintiffs have demonstrated some likelihood of success on the merits of their claims and that they are threatened with irreparable harm if preliminary injunctive relief is not granted. We therefore remain unpersuaded that issuance of the preliminary injunction was an abuse of discretion. Accordingly, the preliminary injunction is **AFFIRMED**.