*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DANIEL WOOD; RONALD GOINS; PRISCILLA
SUE STREET,

                        *Plaintiffs-Appellees*,

       *v*.

DETROIT DIESEL CORPORATION,

                *Defendant-Appellant*,

and

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA and ITS LOCAL 163,

                *Third Party*.

> No. 09-1252

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-74106—Denise Page Hood, District Judge.

Argued: January 22, 2010

Decided and Filed: June 3, 2010

Before: SILER, ROGERS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Thomas G. Kienbaum, KIENBAUM, OPPERWALL, HARDY & PELTON, P.L.C., Birmingham, Michigan, for Appellant. Andrew A. Nickelhoff, SACHS WALDMAN, Detroit, Michigan, for Appellees. **ON BRIEF:** Thomas G. Kienbaum, William Bruce Forrest, III, KIENBAUM, OPPERWALL, HARDY & PELTON, P.L.C., Birmingham, Michigan, for Appellant. Andrew A. Nickelhoff, SACHS WALDMAN, Detroit, Michigan, for Appellees.

    ROGERS, J., delivered the opinion of the court, in which SILER, J., joined. McKEAGUE, J. (pp. 16-19), delivered a separate dissenting opinion.

_____

**OPINION**

_____

ROGERS, Circuit Judge.  Detroit Diesel Corporation and the union representing Detroit Diesel's workers entered into a series of agreements purporting to cap Detroit Diesel's contributions to retiree health care benefits for workers who retired between 1993 and 2004.  Both Detroit Diesel and the union intended this agreement to reduce Detroit Diesel's balance sheet liability after an accounting rule change in late 1992 required—for the first time—that Detroit Diesel account for retiree health care costs on an accrual basis. Detroit Diesel and the union did not renew the agreements capping benefits in the 2004 bargaining cycle, instead implementing a new retiree health care program for post-2004 retirees.  The parties dispute whether the caps continue to apply to 1993-2004 retirees. Interpreting the relevant agreements to provide for continued application of the caps is the most sensible reading of those agreements, is consistent with Detroit Diesel's accounting obligations, and is consistent with our precedents.  The agreed caps therefore continue to apply to 1993-2004 retirees.

**I.**

Detroit Diesel Corporation designs and manufactures diesel engines at a plant in Detroit, Michigan.  The International Union, United Automobile, Aerospace, and Agricultural Workers of America Local 163 (UAW) represents the production and maintenance personnel employed by Detroit Diesel.  Operating under an agreement collectively bargained between Detroit Diesel and the UAW, Detroit Diesel provided health care insurance coverage to its retirees as of 1993.  In that year, Detroit Diesel and the UAW entered into the first of a series of "Cap Agreements," which purported to limit the yearly expenditures by Detroit Diesel for the health care costs of workers who retired after the first Cap Agreement's effective date.  This case concerns the interpretation of those agreements.

The parties entered into the negotiations that eventually led to the first of the Cap Agreements as a result of an accounting rule—FAS 106—promulgated by the Financial Accounting Standards Board in December 1992.  That rule required, for the first time, that publicly traded companies, including Detroit Diesel, account for retiree health care costs on

an accrual basis.  FAS 106 required companies to recognize a liability for the present value of all of their future payments for retiree health care expenditures immediately, rather than including these costs on the company's balance sheet on a pay-as-you-go basis.  *See United Steelworkers v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 274 n.5 (6th Cir. 2007).  FAS 106 also required a presumption that companies would continue to provide the same level of health care benefits, even when those benefits were not vested.  Detroit Diesel's then-Chairman and CEO testified that Detroit Diesel had a capital base of approximately fifty to seventy million dollars in late 1992 and early 1993, and that FAS 106, if implemented without any change to Detroit Diesel's collective bargaining agreements (CBAs), would have resulted in Detroit Diesel's recognizing a one hundred million dollar liability.  Such a change, the then-Chairman testified, could have bankrupted the company by rendering it unable to obtain capital.

To avoid this outcome, as well as to protect the employees' profit sharing and jobs, Detroit Diesel and the UAW entered into the first of the Cap Agreements on January 7, 1993. This 1993 Cap Agreement provided:

> The parties agree to limit [Detroit Diesel]'s contribution toward retiree health benefit premiums.  The 1993 contribution limit will be 110% of 1992 cost per average hourly employee.  The 1994 contribution limit will be 110% of the 1993 limit or 110% of the 1993 cost per average employee, whichever is greater.  These limits are for retirees under the age of 65.  Post age 65 contribution limits are 50% of the pre-65 amounts.
> The above contribution limit is the maximum amount that [Detroit Diesel] will pay per year for health care premium values for each eligible retiree.
> The above contribution limits apply to employees who have retirement dates effective on or after the signing date of this agreement.
> The impact of FAS 106 transition obligation will not affect employee profit sharing.

The 1993 contribution limit proved to be $6,710, and the 1994 limit was $7,381.  The 1993 Cap Agreement also provided that the parties would establish a Voluntary Employee Benefit Association (VEBA) Trust.  The agreement provided that the parties would "utilize this VEBA Trust to automatically pay any premiums in excess of the contribution limit for retiree health care costs and such other benefits as may be allowed under VEBA regulations and agreed to by the parties."  Detroit Diesel agreed to contribute $200,000 to the trust in 1993

and $100,000 in 1994. The parties also agreed that the Detroit Diesel/UAW Joint Training Fund would contribute $100,000 to the trust in each of 1993 and 1994. The 1993 Cap Agreement further provided that "[i]f either party has an issue regarding benefits paid out of the [VEBA] [T]rust and/or the amount or sources of funding into the trust that cannot be resolved by the [VEBA] Committee, then . . . such issue will be collectively bargained among the parties."[1]

Contemporaneously with the signing of the 1993 Cap Agreement, Detroit Diesel Senior Vice-President Paul Walters signed a letter addressed to UAW Region 1A Director Robert King, which stated in part:

> It is the purpose of this letter to state unequivocally that:
> 1.    The [1993 Cap Agreement] limits were established for the purpose of minimizing the financial impact of FAS 106 while still complying with the purpose and intent of such standard.
>
> . . . .
>
> 3.    [Detroit Diesel] fully recognizes, acknowledges and hereby confirms that retiree health care benefits for [Detroit Diesel]/UAW employees have been and will continue to be life-time benefits and that establishment of "contribution limits" in no way modifies or negates this commitment.

The CBA in effect in 1993 expired in 1994. After collective bargaining, the parties entered into the second Cap Agreement, dated August 26, 1994, which was a companion to the 1994 Master CBA. This 1994 Cap Agreement provided, "The current limit of [Detroit Diesel]'s contribution toward post-retirement Health Care, of $7,381, will remain at that amount during the life of the 1994 [Detroit Diesel]/UAW Master Agreement." The 1994 Cap Agreement also provided that the VEBA Trust would receive $1,000,000 per year from the following sources: $420,000 per year from the employee profit-sharing pool, $500,000 per year from the Detroit Diesel/UAW Joint Training Fund, and $80,000 per year from Detroit Diesel.

---

[1] The parties submitted a great deal of extrinsic evidence relating to the 1993 Cap Agreement. Because the agreement was unambiguous, as explained below, we do not rely on that evidence in deciding this case and therefore do not summarize it here. *See Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008).

The 1994 CBA expired in 1998. The third Cap Agreement was signed around March 3, 1999, as a companion to the 1998 Master CBA, and it provided:

1.      The current [sic] of [Detroit Diesel]'s contribution toward post-retirement healthcare for those employees hired prior to August 30, 1998 of $7,381 will remain at that amount during the life of the 1998 [Detroit Diesel]/UAW Master agreement.

2.      Annual Contributions of $500,000 will be made into the [Detroit Diesel] VEBA Trust for the years [1999-2004] from the [Detroit Diesel]/UAW Joint Training Fund account.

The 1998 Master CBA expired in 2004. Detroit Diesel and the UAW entered into a new Master CBA in 2004 that implemented a new health care program for post-2004 retirees. The parties did not enter into any additional agreements regarding Detroit Diesel's contribution limits for 1993-2004 retirees or regarding post-2004 contributions to the VEBA Trust. Within the next two years, the funds in the VEBA Trust were depleted. In August 2005, Detroit Diesel notified retirees who had retired between 1993 and 2004 that they would be responsible for the above-cap costs of their health care beginning in January 2006. For some retirees, such costs were more than eight hundred dollars per month.

Plaintiffs, who are among the retirees notified that they would have to pay above-cap costs, sued Detroit Diesel in October 2005 under the Labor-Management Relations Act, 29 U.S.C. § 185, and the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), arguing that they were entitled to fully funded, lifetime health care benefits. The district court granted plaintiffs' motion for a preliminary injunction requiring Detroit Diesel to continue providing fully funded health care benefits to the retirees during the pendency of this action. *Wood v. Detroit Diesel Corp.*, No. 05-74106, 2005 WL 3579169 (E.D. Mich. Dec. 30, 2005). The district court reasoned that because none of the agreements between Detroit Diesel and the UAW expressly stated that retirees would have to contribute to health care premiums, the plaintiffs had demonstrated a likelihood of success on the merits. *Id.* at *5. We rejected this reasoning

on appeal, holding that the lack of express provision for retiree contributions was not sufficient by itself to establish a likelihood of success because the burden was on the plaintiffs to demonstrate that they had vested rights to health care benefits. *Wood v. Detroit Diesel Corp.*, 213 F. App'x 463, 466-67 (6th Cir. 2007) (citing *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 579-80 (6th Cir. 2006)). But we nevertheless upheld the grant of a preliminary injunction, holding that based on the language in the Paul Walters letter that "health care benefits for [Detroit Diesel]/UAW employees have been and will continue to be life-time benefits," the plaintiffs had "some likelihood" of success, though perhaps not a "strong likelihood." *Id.* at 471.

The parties conducted additional discovery before the district court and then filed cross-motions for summary judgment. The district court granted the plaintiffs' motion for summary judgment and denied the defendant's motion. *Wood v. Detroit Diesel Corp.*, No. 05-74106, slip. op. at 44-45 (E.D. Mich. Feb. 10, 2009). The district court primarily relied on its conclusion that the CBAs in effect from 1993-2004 demonstrated an intent to vest fully funded, lifetime health care benefits to Detroit Diesel retirees. *See id.* at 7-24. The district court found that the Cap Agreements could not alter this vested obligation. *Id.* at 30, 36. The district court also found that the Cap Agreements were ambiguous and that the extrinsic evidence conclusively revealed that the Cap Agreements were never intended to have any substantive effect. *Id.* at 38-43. Detroit Diesel now appeals, arguing that the Cap Agreements apply and that they unambiguously establish that retirees are entitled only to capped benefits.

**II.**

Detroit Diesel is entitled to summary judgment because the only coherent reading of the Cap Agreements establishes that Detroit Diesel retirees are entitled to lifetime, capped health care benefits. For a Detroit Diesel employee who retired in a given year under one of the Cap Agreements, the cap amount applicable to that year both determined and limited the extent of Detroit Diesel's vested obligation to that retiree.

The language of the Cap Agreements plainly determines this outcome for the years enumerated by those Cap Agreements. Consistent with the arguments of the

parties, we assume that the CBA in effect before the signing of the 1993 Cap Agreement granted Detroit Diesel retirees fully funded, lifetime health care benefits under the rules announced by *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064 (6th Cir. 2008), and *Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008). In the 1993 Cap Agreement, Detroit Diesel and the UAW "agree[d] to limit [Detroit Diesel]'s contribution toward retiree health benefit premiums." The 1993 Cap Agreement also provided for the creation of a VEBA Trust and the funding of that trust, and the parties agreed to "utilize this VEBA Trust to automatically pay any premiums in excess of the contribution limit for retiree health care cost." Detroit Diesel employees who retired after the effective date of the 1993 Cap Agreement received their vested health care benefits subject to the limitations imposed by that agreement. Thus, an employee retiring in 1994 did so knowing that Detroit Diesel would pay only the capped amount for that employee's retirement benefits in 1994, and that the VEBA Trust would pay any excess costs to the extent that the trust had sufficient funds. Detroit Diesel was plainly not obligated to pay amounts above the cap levels, even if the VEBA Trust had insufficient funds, as the 1993 Cap Agreement provided that the specified contribution limits were "the maximum amount that [Detroit Diesel] will pay per year for health care premium values for each eligible retiree." The necessary implication of this contract provision is that retirees were responsible for above-cap costs to the extent that the VEBA Trust was insufficient to pay those costs, even if the 1993 Cap Agreement did not directly state this fact.

The same cap continued to apply after the dates covered by a given Cap Agreement under the plainest reading of the Cap Agreements in light of this court's vesting rules. Under this circuit's precedents—which predate the Cap Agreements at issue in this case—health care benefits vest at the point of retirement. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1010-11 (6th Cir. 2009); *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 & n.8 (6th Cir. 1983). In the 1993 Cap Agreement, the parties agreed "to limit [Detroit Diesel]'s contribution toward retiree health benefit premiums" without providing for an expiration date for the limitation. This indicates the broad shift made by the Cap Agreements, which was from an entitlement of a defined benefit—fully funded, lifetime health care benefits—to a defined contribution—the capped dollar

amount. The vested rights of an employee who retired under one of the Cap Agreements were restricted by the parties' agreement "to limit [Detroit Diesel]'s contribution," and thus that employee could not have been entitled—at the point of that employee's retirement—to vested, lifetime, unlimited health care benefits.

This conclusion is supported by the fact that a vested right to fully funded, lifetime health care benefits would be inconsistent with this court's obligation to interpret the provisions of the Cap Agreements "as part of the integrated whole" and "consistently with the entire document and the relative positions and purposes of the parties." *Yolton*, 435 F.3d at 579 (quoting *Yard-Man*, 716 F.2d at 1479). If the caps imposed by the Cap Agreements expired after the dates covered by a given Cap Agreement, this would render those agreements incoherent and would directly undermine the undisputed purpose of the Cap Agreements, which was, in the language of the Paul Walters letter, "minimizing the financial impact of FAS 106 while still complying with the purpose and intent of such standard." Taking the 1993 Cap Agreement as an example, it cannot be that the caps imposed for workers retiring in 1994 expired in 1995 when that Cap Agreement no longer applied to newly retiring workers. In part, this is because it would not make any sense to impose a cap on retiree health care expenses only in the first year of retirement; such an agreement would not be consistent with any applicable purpose. More specifically, it certainly would not be consistent with the parties' clear purpose to reduce Detroit Diesel's FAS 106 liability while still complying with the purpose and intent of FAS 106. If the cap applicable to a 1994 retiree expired in 1995, then the total expected liability for that retiree's health care expenses would not be reduced for any year after 1994. To achieve the purpose of the Cap Agreements, those agreements must have limited the vested rights of Detroit Diesel retirees both during and after the years covered by the Cap Agreements.

That FAS 106 requires employers to presume that current policies will be continued in the future does not mean that Detroit Diesel could have been obligated to provide fully funded lifetime health care benefits yet report a lower obligation to investors. FAS 106 generally provides that, "[a]bsent evidence to the contrary, it shall

be presumed that an employer that has provided postretirement benefits in the past or is currently promising those benefits to employees will continue to provide those future benefits." This prevents employers from falsely assuming that they will cease offering retirement benefits to workers who retire in future years merely because those workers are not yet entitled to vested benefits. FAS 106 similarly provides that "[a]ll assumptions shall presume that the plan will continue in effect in the absence of evidence that it will not continue." FAS 106 does not allow companies to presume the impossible, for the presumption only applies in the absence of evidence to the contrary. If retirees had a vested right to fully funded, lifetime health care expenses after the years covered by a given Cap Agreement, then Detroit Diesel could not have presumed otherwise.

Additionally, our precedents with respect to general durational clauses in CBAs support the conclusion that the caps continued to apply after the years specifically covered by the Cap Agreements. The durational limits in the Cap Agreements were much like the general durational clauses in many CBAs. We have repeatedly considered CBAs that contain language which, for instance, states that the insurance provisions of a CBA "shall continue in effect until the termination of the [CBA] of which this is a part." *Cole*, 549 F.3d at 1071. Even though this language would apparently imply that retiree health benefits would also expire at the termination of the CBA, the rule in this circuit is that "[g]eneral durational provisions only refer to the length of the CBAs and not the period of time contemplated for retiree benefits. Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Id.* (quoting *Yolton*, 435 F.3d at 580-81). We apply this rule because while "the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, . . . someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself." *Id.* (emphasis omitted) (quoting *Yolton*, 435 F.3d at 581). This rule applies to manage the tension between this court's vesting rules, which contemplate fixed, long-term benefits, and the contracts we are called upon to interpret, which are durationally limited. Likewise, the

Cap Agreements in this case impact the vested, long-term rights of Detroit Diesel retirees even though the Cap Agreements themselves are limited to certain years. By analogy to general durational clauses, thus, the caps applicable "to someone contemplating retirement will change with the expiration and adoption" of Cap Agreements, but "someone already retired under a particular" Cap Agreement "continues to receive the benefits provided therein despite the expiration of the agreement itself."[2] *Cf. id.*

An interpretation of the Cap Agreements under which the caps applied only as long as they were renewed by the parties is also inconsistent with the policy considerations underlying our precedents regarding vested benefits. This court's vesting precedents are based on the idea that "it is unlikely that [life and heath insurance benefits for retired workers], which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Yard-Man*, 716 F.2d at 1482. Thus, retiree health care benefits are vested at the point of retirement because "the union owes no obligation to bargain for continued benefits for retirees" and because it would be unfair to allow future agreements between the employer and the union to reduce the pension benefits of retirees when neither the union nor the employer is required to represent those retirees. *See id.* There is therefore no difference between saying that the union and the employer were able to continue the caps in future bargaining rounds and saying that any above-cap benefits were not vested. If the employees had a vested right to above-cap contributions from Detroit Diesel, then no agreement between Detroit Diesel and the UAW could have reduced that right. The Cap Agreements recognized this fact by explicitly exempting already-retired workers from the caps.[3] But workers who retired after the Cap Agreements were effective received vested rights subject to the cap. Detroit Diesel and the UAW might have

---

[2]This reading of the contract leaves some uncertainty whether workers who retired in 1993 are entitled to the 1993 cap level ($6,710) or the 1994-2004 cap level ($7,381). Because Detroit Diesel is apparently capping all retiree benefits at the higher, 1994-2004, level, we need not resolve this question.

[3]For this reason, the caps did not deprive Detroit Diesel employees of any vested rights, as suggested by the court below, *Wood v. Detroit Diesel Corp.*, No. 05-74106, slip. op. at 30, 36 (E.D. Mich. Feb. 10, 2009).

altruistically agreed in later years to provide greater benefits to the retirees—as they effectively did, by agreeing to VEBA Trust contributions—but the vested rights were only to the capped contributions.

Because there is no textually plausible alternative interpretation of the Cap Agreements that is consistent with both Detroit Diesel's accounting obligations and our precedents, the Cap Agreements unambiguously continue to limit the vested benefits to which 1993-2004 Detroit Diesel retirees are entitled. Detroit Diesel is therefore entitled to summary judgment, and we need not consider any of the extrinsic evidence presented by the parties. *See Noe*, 520 F.3d at 552.

This conclusion withstands a number of arguments advanced, implicitly or explicitly, by the plaintiffs. The Cap Agreements cannot be regarded as sham agreements intended only to disguise the nature of Detroit Diesel's retiree obligations for accounting purposes. Detroit Diesel substantially reduced the financial liability it reported under FAS 106 on the basis of the Cap Agreements. If those agreements had no binding effect, then this was plainly deceptive accounting. As explained above, no creative reading of FAS 106's presumption rules could allow Detroit Diesel to report capped future liabilities if retirees were entitled to vested uncapped benefits. Nor is it a sufficient response for the plaintiffs to argue that any reporting issues were the company's responsibility alone. The parties entered into the agreement with the joint purpose of reducing Detroit Diesel's reported liabilities under FAS 106, and not only must we interpret the Cap Agreements "consistently with . . . the purposes of the parties," *Yolton*, 435 F.3d at 579, but we are loath to determine that the two sophisticated parties in this case entered into an agreement that was inconsistent with the applicable accounting standards. Additionally, the interpretation of the Cap Agreements as meaningless finds no grounding in the text of that agreement, as that text both specifically delineates the caps for Detroit Diesel's obligations and states that Detroit Diesel will not have to pay any amounts above those caps.

The fact that the VEBA Trust was set up to pay above-cap costs does not answer the question of who is responsible for above-cap costs when that trust is depleted. There

are three plausible parties that could contribute to retiree health care costs: Detroit Diesel, the VEBA Trust, and the retirees. Detroit Diesel is responsible for payments up to the capped amounts, but those capped amounts are "the maximum amount that [Detroit Diesel] will pay per year for health care premium values for each eligible retiree." The VEBA Trust was created "to automatically pay any premiums in excess of the contribution limit for retiree health care costs," but it could only do so to the extent that it was not depleted. Once the VEBA Trust was depleted, the only parties remaining who could pay above-cap costs were the retirees. Additionally, as discussed above, any implicit requirement that Detroit Diesel pay above-cap costs, even if limited to the case in which the VEBA Trust was depleted, would have been inconsistent with the reporting position taken by Detroit Diesel.

As with the assumptions regarding the caps themselves, the assumptions required by FAS 106 with respect to the VEBA Trust do not change this reality. Detroit Diesel would not be able to assume under FAS 106 that there would be future contributions to the VEBA Trust and thus reduce its projected liability if its retirees had vested rights to fully funded, lifetime health care benefits. FAS 106 allows money placed in a trust for the payment of benefits to be considered an asset of the benefit plan (and thus reduce the employer's liability). But FAS 106 explicitly states that "[a]ssets not segregated in a trust, or otherwise effectively restricted, so that they cannot be used by the employer for other purposes are not plan assets for the purpose of this Statement, even though the employer may intend that those assets be used to provide postretirement benefits." This prevents Detroit Diesel from assuming, for FAS 106 purposes, that additional contributions would be made to the VEBA Trust from some unspecified source such that the VEBA Trust would always pay for healthcare benefit costs above the capped amount. A natural reading of FAS 106 therefore prevents Detroit Diesel from assuming that its obligations to its retirees were capped unless its liability truly was limited.

The plaintiffs argue that *Cole* and *Noe*, as well as the Paul Walters letter, establish that Detroit Diesel employees had, as of 1993, a vested right to fully funded, lifetime health care benefits, and that the Paul Walters letter promises that those benefits

will not in any way be reduced. This argument conflicts with the language of that letter, which states only that "retiree health care benefits . . . have been and will continue to be life-time benefits," and which does not comment upon whether the benefits are capped or uncapped. The plaintiffs respond that this reading renders the Paul Walters letter valueless, for it merely states that the retirees have lifetime benefits, and this was certain given the underlying CBAs. This response relies upon an anachronistic view of the Cap Agreement negotiations; although it might be clear now, after *Noe* and *Cole*, that the CBA in effect in 1993 provided Detroit Diesel workers with vested benefits, this was not clear at the time. The plaintiffs cite what they call the *Golden-Meridian* line of cases for the proposition that the CBAs in effect in 1993 provided for vested benefits. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996); *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417 (6th Cir. 2004). But both *Golden* and *Meridian* post-date the Paul Walters letter. Further, when reviewing the preliminary injunction, this court held that it was unclear whether even *Golden* and *Meridian* provided a sufficient basis on which to hold that the CBA in effect in 1993 provided vested benefits, *Wood*, 213 F. App'x at 467, and the district court held that this uncertainty was only fully resolved in light of *Cole* (decided in 2008), *Wood v. Detroit Diesel Corp.*, No. 05-74106, slip. op. at 10-11 (E.D. Mich. Feb. 10, 2009). Thus, because it was unclear in 1993 whether Detroit Diesel retirees were entitled to vested benefits, the commitment to lifetime benefits in the Paul Walters letter was valuable even though it did not promise lifetime, uncapped benefits.

That the Cap Agreements never directly state that retirees might have to pay out-of-pocket costs does not demonstrate much. As we recognized in our opinion reviewing the district court's grant of a preliminary injunction, any argument based on the lack of such language "implicitly applie[s] a presumption that the retirees' right to health care benefits was vested and then require[s] Detroit Diesel to rebut the presumption by identifying contractual language specifically authorizing the modification it tried to implement. Detroit Diesel correctly argues that such a presumption is improper, as the burden of proving intent to vest rests on plaintiffs." *Wood*, 213 F. App'x at 466-67 (citing *Yolton*, 435 F.3d at 579-80).

The plaintiffs also argue that if the Cap Agreement created "vested" caps, then those agreements should also be read to create vested obligations to contribute to the VEBA Trust. The language of the 1993 Cap Agreement, which provides only for specifically enumerated payments and states that disputes over the funding sources of the VEBA Trust are to be resolved by collective bargaining, shows that this argument is not valid.

The plaintiffs support their theory that the Cap Agreements were intended as mere accounting devices with a significant amount of extrinsic evidence, including an unsigned letter, purportedly from Detroit Diesel President Roger Penske, promising that the company would provide sufficient funds to ensure that retiree costs would be fully paid if the VEBA Trust even contained insufficient funds. We do not consider this extrinsic evidence given our conclusion that the Cap Agreements are unambiguous. *See Noe*, 520 F.3d at 552. Additionally, the promise in the purported Roger Penske letter would turn the caps provided by the Cap Agreements into mere shams; if Detroit Diesel had made an enforceable promise to provide lifetime, fully funded health care benefits to retirees, then it could not have reported lesser liabilities to investors under FAS 106.

None of this is to say that the parties did not intend to provide sufficient funds for retiree health care benefits. The parties clearly hoped that they would be able to provide such benefits, and they relied upon future negotiations over the VEBA Trust to reach that result. However, to accomplish the parties' joint goal of reducing Detroit Diesel's reported liabilities under FAS 106, it was necessary to shift the risk of above-cap costs off the company by capping retirees' vested health care benefits. If lifetime fully funded benefits remained in place—no matter how structured or hidden—then reporting a reduced liability level to investors would not have been consistent with Detroit Diesel's accounting responsibilities. Under the only interpretation of the Cap Agreements that is consistent with their plain language, with honesty to investors, and with our precedents, the caps continue to apply to 1993-2004 retirees.

## III.

For these reasons, we **REVERSE** the judgment of the district court and **REMAND** with instructions to grant Detroit Diesel's motion for summary judgment.

————————————

**DISSENT**

————————————

McKEAGUE, Circuit Judge, dissenting. Despite my colleagues' substantial and worthy efforts, I remain unpersuaded that Detroit Diesel succeeded, through the language of the Cap Agreements, in altering its undisputed pre-existing commitment to provide fully-funded lifetime health care benefits to its retirees. Because the Cap Agreement language itself and subsequent communications between Detroit Diesel and its employees assiduously avoided informing them of any transfer of funding responsibility for health care benefits from Detroit Diesel to retirees before they retired, I would hold that their entitlement to fully-funded lifetime benefits vested upon retirement and that Detroit Diesel's unilateral attempt to alter this entitlement in 2006 was impermissible. I therefore respectfully dissent.

In short, my disagreement with the majority stems from five considerations. First, Detroit Diesel does not dispute that until 1993, when the first Cap Agreement was entered into, it had, under the governing collective bargaining agreements, provided fully-funded lifetime health care coverage to its employees after retirement. From 1993 to 2004, plaintiffs in this action continued to work for Detroit Diesel under materially identical collective bargaining agreements, as supplemented by the Cap Agreements. That the material language in these UAW collective bargaining agreements effectively gave rise to vested entitlement to fully-funded lifetime health care benefits upon retirement is clearly established by our decisions in *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069-70 (6th Cir. 2008), and *Noe v. PolyOne Corp.*, 520 F.3d 549, 552 (6th Cir. 2008). These are the factual and legal premises for the fundamental question presented in this case: whether the Cap Agreements altered the employees' otherwise vested right to health care benefits upon retirement.

Second, the Cap Agreement language, succinct and carefully worded, does not, on its face, in any way limit retirees' benefits. What is limited, or "capped," is Detroit Diesel's premium contribution obligation. Further, the Cap Agreement expressly

provides that any required premiums in excess of Detroit Diesel's contribution limit would be paid, *not* by the retirees, but by the VEBA Trust, which was jointly established and administered by Detroit Diesel and the UAW. Thus, the Cap Agreement language does not inform employees of any change in the rights otherwise conferred on them by the governing collective bargaining agreement. In other words, their pre-existing right to fully-funded lifetime health care benefits upon retirement was not affected by the plain language of the Cap Agreement.

Third, that the plain language of the Cap Agreement meant only what it purported to say was confirmed by Detroit Diesel in a writing executed contemporaneously with the first Cap Agreement in 1993. Insofar as the Cap Agreement language might be construed as *impliedly* transferring *potential* responsibility for future above-cap costs to retirees, the UAW sought clarification from Detroit Diesel prior to entering into the first Cap Agreement. The reassuring answer came in the form of a letter from Detroit Diesel Senior Vice President Paul F. Walters to UAW Regional Director Robert King, "the Walters letter," which both sides urge us to consult in construing the Cap Agreement language. Walters made it clear that Detroit Diesel continued to fully recognize, acknowledge and confirm that retiree health care benefits had been and would continue to be lifetime benefits and that the establishment of limits on Detroit Diesel's premium contribution obligation in no way modified or negated this commitment. The Walters letter could hardly be clearer: the Cap Agreement limits on Detroit Diesel's premium contribution obligation were not to modify retiree benefits in any way. Only after receiving this reassurance did the UAW enter into the first Cap Agreement.

Fourth, this understanding of the Cap Agreements' non-impact on retirees' rights was substantiated by the subsequent course of conduct between the parties. For example, in a joint presentation to employees by Detroit Diesel Chairman Roger Penske and UAW Vice President Robert King in early 1993, the premium contribution limit was portrayed, in conjunction with the VEBA Trust, as part of a cooperative effort to control health care costs while protecting and maintaining existing retiree health care benefits.

Any reference to a possibility of future retiree contributions was conspicuously avoided. And indeed, for the twelve years that the Cap Agreements were in place, the parties managed to cooperate in such a way as to effectively limit Detroit Diesel's liability for retiree health care costs while continuing to afford fully-funded benefits without requiring retiree contributions.

Fifth, inasmuch as the Cap Agreements were precipitated in part by Detroit Diesel's desire to minimize the negative impact of new accounting requirements imposed by Financial Accounting Standard 106 ("FAS 106"), it is noteworthy that Detroit Diesel was entitled, under the terms of FAS 106, to report its retiree health care coverage liability as effectively limited by the Cap Agreements even though the contribution limits in place from 1993 through 2004 were not necessarily immutable. *See* FAS 106, ¶¶ 30, 35, 56, 175, 180 and 182 (providing essentially that an employer is entitled to report retiree health care liability based on assumptions derived from the best information available and current plan terms, reducing its projected costs based on cost-sharing provisions (e.g., VEBA Trust contributions), without needing to anticipate any possibility of future changes, as changes are to be reported as gains or losses only when they occur). In other words, holding that the Cap Agreements, consistent with their plain language, did not alter employees' right to fully-funded lifetime health care benefits upon retirement, would not render Detroit Diesel's past reporting of its retiree health care liability fraudulent or deceptive or otherwise improper under FAS 106.

In sum, these considerations lead me to conclude that the Cap Agreements, though effective to serve their designed purpose while in effect, did not alter Detroit Diesel employees' otherwise vested right to fully-funded lifetime health care benefits upon retirement. In my opinion, Detroit Diesel, by refraining from expressly transferring responsibility for future above-cap costs to the retirees (i.e., in the event the VEBA Trust and other cost control efforts failed), and by expressly disclaiming any intent to do so in the Walters letter, effectively left employees' pre-existing rights intact and assumed the risk that the burden of above-cap costs could revert to it if the Cap Agreements were not continued. It follows that when the Cap Agreements expired and were not

continued, it became incumbent on Detroit Diesel to fulfill its pre-existing and continuing collective bargaining agreement promise, even though this could require it to bear costs in excess of the previously applicable premium contribution limits. I do not maintain that the majority's contrary analysis of the existing record under the governing law is untenable. Yet, for the reasons summarized above, I would affirm the result reached by the district court.